751 A.2d 9 (2000)
132 Md. App. 99
S.F.
v.
M.D.
No. 1746, Sept. Term, 1999.
Court of Special Appeals of Maryland.
May 2, 2000.
*10 Dorrance D. Dickens (Deborah, Luxenberg & Luxenberg, Johnson & Dickens, P.C., on the brief), Washington, DC, for appellant.
Robert Case Liotta (Liotta, Dranitzle & Engel, LLP, on the brief), Washington, DC, for appellee.
Argued before MOYLAN, EYLER and SONNER, JJ.
EYLER, Judge.
Appellant, S.F., and appellee, M.D., both females, began living together in 1991 in a committed domestic relationship. On September 30, 1994, appellee gave birth to a child following artificial insemination. The parties separated in 1997. This case involves appellant's right to visitation with the minor child. The circuit court, faced with a difficult question, denied visitation.

Facts
Appellant filed a complaint in the Circuit Court for Montgomery County against appellee, seeking custody of the minor child, or in the alternative, visitation. Appellant, in the portion of her brief setting forth the facts, largely tracks the circuit court's opinion. We shall do the same.
Appellant and appellee began dating each other in 1990 and commenced living together in 1991. Appellant, in 1990, decided she wanted to have a child, but all efforts, including six in vitro fertilizations, failed. Appellee supported appellant in her efforts. Because appellant's efforts failed, and because the couple wanted to have a child to rear together, appellee decided to become pregnant. Appellant opened a sperm bank account and obtained sperm from an anonymous donor. Appellant, a licensed medical doctor, personally inseminated appellee on several occasions, and ultimately, appellee became pregnant. On September 30, 1994, appellee gave birth.
*11 After the birth, the parties jointly participated in rearing the child, including the selection of pediatricians and preschool. Appellant, a psychiatrist, and appellee, an epidemiologist, arranged their schedules to work out of the home so that one or the other was almost always available to care for the child.
Appellee was the primary care giver, but for the first three years appellant participated in feeding, playing with, bathing, and holding the child. Appellant developed a bedtime ritual, whereby she would read for one-half hour to forty-five minutes to the child, following which appellee would say good night.
The parties experienced problems in their relationship as early as 1992 or 1993, and they went to therapy on at least two occasions. In September 1997, appellee moved out of the family home and took the child with her. The parties agreed on a liberal visitation schedule.
Beginning in December 1997, according to appellee, the child exhibited changes in behavior. The child had difficulty getting to sleep at night, began clinging to appellee, and was frequently whiny. The child also displayed "oppositional" behavior to appellee, and in the Spring of 1998, the child's teachers reported to appellee that the child was exhibiting "tantrums or meltdowns." During this time frame, appellee discontinued appellant's ritual of bedtime reading. Appellee discussed the child's behavior with appellee's neighbor and friend, K.H.[1], but did not take any other action. Appellant indicated that she did not observe any such symptoms when the child was with her, but acknowledged that appellee told appellant that the child was having trouble sleeping.
On May 27, 1998, the parties argued over a bicycle, and appellee refused thereafter to let appellant visit with the child. According to appellee, the child's whiny and clingy behavior stopped within two weeks, and the bedtime problems resolved themselves in three months. After school began in September, there was no abnormal behavior reported by the child's teachers.
In December 1998, the circuit court, after a pendente lite hearing, ordered a resumption of visitation between appellant and the child so that their relationship could be evaluated by a court-appointed psychologist, Dr. Benjamin Schutz. Within a few weeks of resumption of the visitation, most of the behavior problems returned.
The case was tried in March of 1999, and following the trial, the circuit court took the matter under advisement. On or about May 7, 1999, appellee terminated all visitation between appellant and the child, claiming that the child's behavior had worsened. The circuit court ordered a follow-up evaluation by Dr. Schutz, and additional testimony was taken on June 8 and July 2, 1999. According to Dr. Schutz, the child's teachers reported that the meltdowns or tantrums had stopped in April or May 1999, and the child had no problems interacting with the child's peers. There was testimony by appellee; by K.H.; and by Dr. Schutz, based on information supplied to him by Dr. Joan Evelyn Kinlan, the child's psychiatrist, however, that the child had developed a "rigid fantasy role-playing wherein [the child] would assume the role of another person or animal and assign roles to people around [the child] and interact only within those roles." Appellant testified that she did not observe this behavior. According to appellee, when visitation with appellant terminated in May 1999, the fantasy play ceased.
The circuit court, in its opinion on August 10, 1999, made the following findings and conclusions. First, the court stated that appellant neither presented evidence nor argued that she was entitled to custody of the child. The court stated that the only issue was one of visitation and that the case was to be decided under Maryland *12 law regarding third party visitation rights. Consequently, the court concluded that the standard for determining whether to grant visitation to appellant, a third party, was the best interest of the child. See Evans v. Evans, 302 Md. 334, 488 A.2d 157 (1985).
Second, with respect to the relationship between appellant and the child, the circuit court found that appellant served "the functional role of a parent in relation to [the child] for the first three years eight months of [the child's] life." The parties lived together as a couple and jointly decided to have a family. Appellant was an integral part of the prenatal care of appellee, and after the child was born, appellant played a significant role in the child's care, demonstrating above-average parenting skills.
Third, the court found that the relationship between appellant and the child, in the past, had been beneficial to the child. Dr. Schutz found nothing inappropriate, detrimental, or negative in appellant's conduct with the child.
Fourth, the circuit court found that appellant was a fit and proper person to have visitation with the child. There was no evidence of any abuse, neglect, or adverse conduct by appellant toward the child.
Fifth, and determinative of the outcome, the circuit court found that it was not in the best interest of the child to continue a relationship with appellant. The court acknowledged that this was a difficult question, and regardless of the decision, there would be significant adverse consequences to the child.
The court concluded as follows:
If visitation is terminated completely, [the child] will lose a significant positive relationship with someone who has served as a parent for most of [the child's] life.[2]
This may have a long-term negative effect on [the child] because, according to Dr. Schutz, [the child] may have acquired a negative learned response from a beneficial relationship being easily excised and, according to Dr. Peebles [the child's pediatrician], the security of [the child's] relationship with the defendant may be jeopardized.
On the other hand, the evidence in this case is uncontroverted that when there is visitation between the plaintiff and [the child] significant behavioral problems emerge in [the child], and when the visitation is terminated completely, all of these problems disappear.
It is also uncontroverted that when visitation was terminated with the plaintiff, [the child] expressed no sense of loss, exhibited no signs of depression and did not ask to see the plaintiff.
When the visitation occurred between December 1997 and May 1998, [the child] had difficulty going to sleep, was clingy, whiny, oppositional, tantrums and checking behavior at school and problems playing with peers.
When the visitation was resumed in December 1998 to March of 1999, the same symptoms reappeared, except for the checking behavior.
In addition, the re-emergence of the symptoms in December of 1998 was unrelated to the frequency or duration of visitation because the later visitation schedule was significantly different than the visitation schedule for the earlier time period.
Dr. Schutz did opine that the aforementioned behavior problems of [the child] were stress-related and could be ameliorated by a proper visitation schedule, counseling of the parties to support both relationships and better communication between the plaintiff and the defendant.

*13 However, of greater importance is [the child's] most recent behavior. In April and May of 1999, [the child's] temper tantrums and oppositional behavior and peer problems at school disappeared.
[The child] became [the child's] old self. At home, though, [the child] began exhibiting a rigid fantasy role play when dealing with [the child's] mother and [the child's] neighbor.
In other words, [the child's] behavioral problems mutated into what Dr. Schutz described as a rigid systematic refusal by [the child] to engage [the child's] mother except through a rigid fantasy role play.
Dr. Schutz had never seen a child do this in his career and had never seen the level of intensity so severe as in this case.
[The child's] behavior was now clearly dysfunctional. Dr. Schutz was also at a loss to explain the cause of [the child's] behavior.
He could not link the conduct of either plaintiff or defendant to [the child's] symptomology. Dr. Schutz concluded that unless things change, [the child] simply cannot sustain relationships with both plaintiff and defendant at this time.
He was not very hopeful about any change in the current contacts because of two past failed therapies between the parties.
Finally, when the defendant again terminated the plaintiff's visitation with [the child] in May of 1999, the rigid fantasy role play disappeared.
Therefore, the Court finds that a resumption of the visitation between the plaintiff and [the child] will have a severe and detrimental effect on [the child] that outweighs the benefits of continuing such relationship.
I must emphasize that nothing the plaintiff has said, done or not done has caused this detrimental effect. Indeed, I can find no fault with the manner in which the plaintiff has conducted herself in her relationship with [the child].
The plaintiff has acted always as a loving and caring parent toward [the child]. Unfortunately, Dr. Schutz was unable to determine the cause of [the child's] behavior and its change from stress-related to dysfunctional.
Without the cause identified, the cure cannot be prescribed. Thus, a resumption of visitation will, in all likelihood, result in a return of [the child's] dysfunctional behavior.
Accordingly, the Court concludes that it is not in the best interest of [the child] for the Court to order any visitation with the plaintiff, [S.F.].
The plaintiff's complaint for custody and visitation will be denied. The defendant's request for attorneys' fees will be denied.
The plaintiff's request for sanctions for contempt will be denied. I have two postscripts. The first, my comments are going to be directed to the defendant, [M.D.].
Even though, [Ms. D.] or [Dr. D.], you have prevailed in this case, I urge you not to schedule any celebration party.
You have exhibited in my view a trial [sic] that [can] only be described as a pathological hatred for the plaintiff, pathological because it is extreme. In my view, it is not based on reality.
It has also caused you to attempt in your testimony to rewrite the history of your relationship with the plaintiff and the plaintiff's relationship with [the child].
More seriously, Dr. Schutz was unable to identify the cause of [the child's] behavioral problems, but I strongly suspect, although I cannot find from the evidence that it was your hatred of the plaintiff that leaked out to [the child] and caused [the child] to react in the way [the child] has to the visitation with the plaintiff.

*14 I hope I am wrong, but if I am right, it is you who has destroyed a positive relationship with the plaintiff and [the child] and caused psychological trauma to [the child].
I urge you to enter counseling to explore this possibility so there is not a repeat of what has happened here regarding a future relationship for [the child].
It is for [the child's] sake that I make these comments.

Question Presented
Appellant raises one question on appeal, which as rephrased by us, asks whether the circuit court's findings were clearly erroneous and whether it abused its discretion in failing to grant visitation rights to appellant.

Discussion
We are fully aware that the Supreme Court of the United States and the Maryland Court of Appeals have recognized that a natural parent has a fundamental right regarding the care and custody of his or her child. See Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Boswell v. Boswell, 352 Md. 204, 217, 721 A.2d 662 (1998). Nevertheless, the best interest of the child may take precedence over a parent's liberty interests in a custody, visitation, or adoption dispute. Id. at 219, 721 A.2d 662. Moreover, this court has held that "we are uncertain as to the character of the parental right at stake when the issue involves visitation rights rather than custody or the termination of parental rights." Wolinski v. Browneller, 115 Md.App. 285, 302, 693 A.2d 30 (1997).[3] In any event, a natural parent does not have a constitutional right to deny all visitation, if visitation would be in the best interest of the child. Finally, from our reading of the case law, it is clear that a third party has no fundamental constitutional right to visitation. The issue before us is thus largely governed by family law, not constitutional law.
In child custody and visitation cases, Maryland appellate courts have identified several factors to be considered by trial courts as appropriate under the circumstances, but the overriding determination is always the best interest of the child. See Boswell, 352 Md. at 219, 721 A.2d 662; Wolinski, 115 Md.App. at 301, 693 A.2d 30. In the case sub judice, that is the governing standard, and as explained below, presumptions and more specific statements of required showings which might be applicable in other cases are not applicable here.
As appellant is neither a biological nor adoptive parent, the natural starting point for our discussion is Evans, supra, the seminal Maryland case involving third party visitation. In Evans, a stepmother sought visitation with her ex-husband's son from an earlier marriage. 302 Md. at 335, 488 A.2d 157. The Court of Appeals, in answering the question of whether a stepparent has a right to seek visitation, examined whether the grandparents visitation statute, Md.Code (1980 Repl. Vol), § 3-602(a)(4) of the Courts and Judicial Proceedings Article, precluded the possibility of visitation by other third parties. Id. The Court of Appeals held that there was no statutory limitation on the jurisdiction of courts with respect to whom custody or visitation could be awarded. Id. at 343, 488 A.2d 157.
The substance of § 3-602 of the Courts and Judicial Proceedings Article, construed in Evans, presently appears in Md.Code (1999 Repl.Vol.), §§ 9-102 and 1-201 of the Family Law Article. Section 1-201, dealing with the jurisdiction of equity courts, does not expressly limit to whom a court may award custody or visitation, the same as its predecessor. Additionally, since the Evans decision, by Acts of 1991, § 2, ch. 247, amending § 9-102 in a manner not here pertinent, the legislature stated *15 that the grandparents visitation statute should not be construed to deny or limit visitation of other individuals. As a result, in Maryland, petitioners, when seeking custody or visitation, do not have the standing problem that frequently exists in other states. See, e.g., In re Guardianship of Z.C.W., 71 Cal.App.4th 524, 84 Cal.Rptr.2d 48, cert. denied by Crandall v. Wagner, ___ U.S. ____, 120 S.Ct. 603, 145 L.Ed.2d 501 (1999)(a non-biological, non-adoptive parent in a same sex relationship lacked standing to seek custody or visitation). Accord In Re Thompson, 11 S.W.3rd 913 (Tenn.Ct.App.1999); Titchenal v. Dexter, 166 Vt. 373, 693 A.2d 682 (1997). Consequently, appellant in this case had standing to seek visitation.
As mentioned previously, in custody and visitation matters, the best interest of the child is always determinative. In a custody dispute, however, when the dispute is between a biological parent and a third party, there is a presumption that the child's best interest is served by awarding custody to the biological parent. See Newkirk v. Newkirk, 73 Md.App. 588, 593, 535 A.2d 947 (1988).[4] This presumption can be overcome by a showing of the parent's unfitness or by exceptional circumstance. See Ross v. Hoffman, 280 Md. 172, 178-79, 372 A.2d 582 (1977); Tedesco v. Tedesco, 111 Md.App. 648, 656, 683 A.2d 1133 (1996).
The question then arises as to whether a third party faces the same presumption when seeking visitation rights. The Court of Appeals has held that grandparents do not need to make a showing of exceptional circumstances when seeking visitation, effectively ruling that the presumption does not apply in that situation. See Fairbanks v. McCarter, 330 Md. 39, 622 A.2d 121 (1993). We are not aware of any Maryland case that has applied the exceptional circumstances test in a visitation context, and while it may not be free from doubt with respect to third parties other than grandparents, we hold that the presumption does not apply when a de facto parent seeks visitation. In determining whether one is a de facto parent, we employ the test enunciated in In re Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419 (1995), and V.C. v. M.J.B., 163 N.J. 200, 748 A.2d 539 (2000). Under that test, "the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged." V.C., 163 N.J. at 223, 748 A.2d 539. The presumption may be applicable if the issue is the schedule of visitation, see Wolinski, 115 Md.App. at 317-19, 693 A.2d 30, but the issue before us is the right to visitation. Consequently, even though appellant, as a non-biological, non-adoptive parent, is in the position of a third party under the Maryland custody and visitation cases, because only the right to visitation is at issue, and she is a de facto parent, she is not required to show unfitness of the biological parent or exceptional circumstances. In other words, there is no presumption that she is not entitled to visitation. On the other hand, as a third party, appellant is not entitled to the presumption that liberal unrestricted visitation with a noncustodial biological or adoptive parent is in the best interest of the child. See Boswell, 352 Md. at 221, 721 A.2d 662. From appellee's perspective, at most, as a biological parent, she would be entitled to a presumption with respect to custody and perhaps as to a schedule of visitation, but custody and scheduling are not the issues before us.
The case before us is most akin to a stepparent seeking visitation.[5] In Monroe *16 v. Monroe, 329 Md. 758, 621 A.2d 898 (1993), the biological mother sought custody vis-a-vis her estranged husband, who was the non-biological father of the child, but who acknowledged paternity and treated the child as his own. In that case, the trial court had ruled that exceptional circumstances did not exist as a matter of law. Id. at 774, 621 A.2d 898. The Court of Appeals held that the evidence was sufficient to support a determination by the master that exceptional circumstances existed and remanded the case to the trial court to make a factual determination. Id. at 777, 621 A.2d 898. The salient point for the case sub judice is that the Court of Appeals treated the father as a third party for purposes of the custody proceeding. Id. at 773-74, 621 A.2d 898. Accord Tedesco, 111 Md.App. at 659, 683 A.2d 1133.
In Sider v. Sider 334 Md. 512, 639 A.2d 1076 (1994), a child was born as a result of an affair between the father and the mother, the latter married to another man. The mother's husband sought custody of the child, while the mother and the biological father advocated awarding custody of the child to the mother. Id. at 530, 639 A.2d 1076. The mother's husband was treated as a third party. Id. The Court of Appeals stated that custody disputes between third parties and parents were governed by the Ross v. Hoffman, supra, exceptional circumstances test. Id. at 532, 639 A.2d 1076. The Court of Appeals, in Ross, a case involving parties not related to the child by blood or marriage, identified a non-exhaustive list of factors to be considered in a third party-parent custody dispute that was repeated and expanded in Sider as follows:
(1) the length of time the child has been away from the biological parent;
(2) The age of the child when care was assumed by the third party;
(3) The possible emotional effect on the child of a change of custody;
(4) The period of time which elapsed before the parent sought to reclaim the child;
(5) The nature and strength of the ties between the child and the third party custodian;
(6) The intensity and genuineness of the parent's desire to have the child; and
(7) The stability and certainty as to the child's future in the custody of the parent.
Sider, 334 Md. at 532, 639 A.2d 1076 (citations omitted).
In Fairbanks, supra, the Court of Appeals set forth the following factors and circumstances that should be considered in assessing the best interest of the child in a case in which grandparents sought visitation.
[T]he nature and stability of the child's relationships with its parents; the nature and substantiality of the relationship between the child and the grandparent, taking into account frequency of contact, regularity of contact, and amount of time spent together; the potential benefits and detriments to the child in granting the visitation order; the effect, if any, grandparental visitation would have on the child's attachment to its nuclear family, the physical and emotional health of the adults involved; and the stability of the child's living and schooling arrangements.
330 Md. at 50, 622 A.2d 121.
We have discovered no Maryland cases involving the fact pattern presented in the case sub judice, i.e., a de facto parent with a significant relationship with the child, seeking visitation. We conclude, however, based largely on stepparent cases, that a de facto parent, such as appellant, is a third party. In our view, however, most of the factors set forth in Ross, Sider, and Fairbanks, stepparent and grandparent cases, have little relevance to the situation before us because in *17 stepparent cases, the factors relate to custody and in grandparent cases the factors assume a relationship that was functionally non-parental. Appellant is a fit de facto parent and seeks visitation. It is the best interest of the child, determined by the effect of visitation on the child, that is relevant and determinative in this case. That was the circuit court's approach, and it was correct.
We are limited in our appellate review of visitation and custody orders. If we "conclude[ ] that the factual findings of the trial court are not clearly erroneous and that sound principles of law were applied, the trial court's decision will not be disturbed unless there has been a clear abuse of discretion." Boswell, 352 Md. at 225, 721 A.2d 662. "In almost every case, the chancellor's decision regarding custody and visitation is given great deference `unless it is arbitrary or clearly wrong.'" Id. (quoting Hanke v. Hanke, 94 Md.App. 65, 71, 615 A.2d 1205 (1992)).
In the case sub judice, appellant argues that the circuit court's findings were clearly erroneous because they were "against the logic and effect of facts and inferences before the court." Appellant elaborates by stating that the court found four key facts and that it based its ultimate decision on those facts. The key findings, according to appellant, were (1) that the child's behavior had become clearly dysfunctional, (2) that Dr. Schutz could not link the conduct of either party to the child's symptomatology, (3) Dr. Schutz was not hopeful about any change in the current situation, and (4) a resumption of visitation between appellant and the child would have a severe and detrimental effect on the child.
We acknowledge the difficulty of the decision before the circuit court. It seems that custody and visitation cases are rarely, if ever, easy. That is especially true when neither party seeking custody or visitation is fit or, as in the case before us, when both parties seeking custody or visitation are fit. Based on our review of the record, we cannot find that the circuit court's findings were clearly erroneous, or that it abused its discretion.
Three persons testified at the March trial as expert witnesses. Appellant, on her own behalf, testified as an expert; Dr. Paul Peebles, the child's pediatrician up until March of 1998, testified for appellant; and Dr. Schutz, the court-appointed psychiatrist. Appellant's testimony supported her position. Dr. Peebles testified, based on his review of Dr. Schutz's report, that it was in the best interest of the child to continue a relationship with appellant. He recognized the gravity of the situation but, in essence, believed that the two adult parties should seek counseling to enable the child to have a relationship with both. Dr. Schutz, at the time of trial in March, appeared to be of the view that it was in the child's best interest to maintain a relationship with appellant, or at least to make a further effort in that regard.
At the time of Dr. Schutz's testimony on June 8 and July 2, 1999, he had obtained additional information. Specifically, he testified that he had interviewed the child's psychiatrist, Dr. Kinlan, the child's schoolteachers, appellant, appellee, K.H., and the child.
Dr. Schutz concluded that, when the child attempted to forge a relationship with both appellant and appellee at the same time, the relationship with appellee deteriorated. He stated that he did not know why but offered two hypotheses, (1) that the child was angry with the child's mother for sending the child from where the child wanted to be to a place where the child did not want to go, and (2) that appellee conveyed an emotional message to the child that the child should not have a good time with appellant or want to be with appellant and that the child was angry over [the child's] inability to enjoy time with appellant; and this forced the child into a choice between appellant and appellee. In response to assertions by appellee and Dr. Kinlan that appellant had *18 asked the child to call her "Mother," Dr. Schutz also opined that labeling the roles of two persons in a parental relationship and the risk of confounding the roles when they are both contenders for the same role and the same identification is greater than in the case of heterosexual couples.
With respect to the severity of the child's problems, Dr. Schutz observed,
... I have never seen a clinical picture of such intensity like this before in any evaluation I have ever done.
Where this particular picture of a child's developing these kinds of symptoms of this severity with a context like this.
In response to an inquiry as to whether Dr. Peebles was correct that the child would master the stress if given an adequate chance, Dr. Schutz opined that he could not make that prediction and explained again that he had never seen a child with the cluster of behaviors exhibited. The behavior referred to was as reported by appellee, K.H., and Dr. Kinlan, which Dr. Schutz described as "rigid, in my mind oppositional, systematic refusal to engage a parent in any way other than through the medium of the role playing." He concluded that that response was precipitated by a very high level of stress, and it was the stress that made the child "so dysfunctional."
With respect to the ultimate issue, balancing what Dr. Schutz described as the negative learning experience of ending the relationship with appellant versus the manifestations exhibited by the role playing, the latter described as "an unknown phenomenon," he could not predict the long term manifestations of the symptomatology.
At another point, the following colloquy occurred:
Q My final question, doctor, is there any question in your mind that the security of the attachment of [the child] to [the child's] mother is more important than any attachment or any relationship that [the child] may have with [appellee], I mean, with [appellant], if we have to choose?
I know you don't want to choose, but if weif you have to?
A I feel like Solomon being handed a chainsaw. If there were
Q I didn't think it was quite that loaded a question. I am not asking you to make the decision. It seems obvious to me, and obvious to everything you have said that the attachment to [the child's] mother, which is under stress, is the more important.
A It is a significant factor related to long term adjustment for kids.
Q I think you significantly sidestepped my question, but I will terminate at that point.
In summary, in March Dr. Schutz opined that, based on the functionally parental relationship between appellant and the child, the relationship should continue (1) subject to family therapy, (2) visitation of length consistent with the best interest of the child based on observation by a clinician, and (3) establishing communication between appellant and appellee. At the time of the conclusion of testimony in June and July, however, Dr. Schutz opined that the situation was much more problematic and severe because of the subsequent symptomatology. He also opined that, even with therapeutic intervention, a relationship between appellant and the child would be problematic because the situation had become "very extreme." Dr. Schutz was also clear that, for whatever reason, the symptomatology was associated with visitation with appellant. The bottom line, according to Dr. Schutz, was that the child could not negotiate both relationships at the same time, and the parties had not been successful in enabling the child to do that.
We end with the observation with which we began, which is that the circuit court had a difficult decision to make. The court applied the applicable law, and the findings *19 of fact were not clearly erroneous. Appellant, at oral argument, asserted that an affirmance will reward appellee's manipulation of the child. If there were a finding of fact in that regard, we might well agree. The circuit court, while expressing suspicion, expressly stated that it could not find as a fact that appellee caused the situation that existed. There is no basis upon which to hold that finding clearly erroneous. Legal disputes in general, and custody and visitation disputes in particular, are fact dependent and must be resolved on a case by case basis. With respect to the circuit court's disposition, the question is not what we or another court might have done; it is whether the circuit court abused its discretion. We hold that it did not.
JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.
NOTES
[1] "K.H." has been substituted for the neighbor's given name.
[2] "The child" has been substituted for the child's given name. The "plaintiff" is appellant, and the "defendant" is appellee.
[3] In Wolinski, Judge Davis, writing for this Court, reviewed at length the constitutional rights of parents. 115 Md.App. at 297-303, 693 A.2d 30.
[4] Presumably, the presumption also applies when the dispute is between an adoptive parent and a third party. See Md.Code (1999 Repl.Vol.), § 5-308 of the Family Law Article (individual adopted is child of petitioner for all intents or purposes).
[5] At oral argument, appellant's counsel acknowledged that stepparent cases are very similar, and the only difference asserted was that when both biological parents are alive, the competition is among three persons in a "parental" relationship.