NAZARIAN, J.,
concurring.
I agree with the majority that this case is sad, but I would add the adjective “frustrating.” I have no idea whether Michelle Conover[1] should have visitation with Jaxon—the evidence adduced in the circuit court creates, at the very least, a fair dispute about whether visitation would be in Jaxon’s best interest. But unlike every other divorce case with child visitation in dispute that I have encountered in my time on this Court, we don’t, and can’t, even reach the question of Jaxon’s best interests. I agree with the majority that Janice M. v. Margaret K., 404 Md. 661, 948 A.2d 73 (2008) compels this conclusion and that we, as our State’s intermediate appellate court, are not at liberty to hold otherwise. However, the General Assembly’s intervening recognition of same-sex marriages, see The Civil Marriage Protection Act, 2012 Md. Laws Ch. 2, raises doubt about whether a divorcing same-sex spouse should begin the visitation analysis as a third party to her non-biological non-adopted child, as the same-sex partner in Janice M. did and Michelle does here.[2]
I.
Although the parties are both women, this is a divorce case, and a relatively simple one on the surface. It started with Brittany’s complaint, which Michelle answered, and evolved *387 with Michelle’s counter-complaint. Their form pleadings established that both wanted a divorce, that neither sought support or alimony from the other, and that Michelle was not seeking custody.[3] The only real dispute was whether Michelle was entitled to any visitation with Jaxon.
Brittany took the position, and the circuit court ultimately agreed, that Michelle is a third party vis-a-vis Jaxon, not a parent. This difference matters tremendously. If Michelle is a parent, her right to visitation depends on Jaxon’s best interests, and the court presumes that his interests are furthered by some sort of ongoing relationship with his noncustodial parent. See Boswell v. Boswell, 352 Md. 204, 220, 721 A.2d 662 (1998) (“As to visitation, the non-custodial parent has a right to liberal visitation with his or her child ‘at reasonable times and under reasonable conditions,’ but this right is not absolute.” (citation omitted)); Michael Gerald D. v. Roseann B., 220 Md.App. 669, 680, 105 A.3d 578 (2014) (“[A]s a general rule, a parent, who is not granted custody, will be given ‘a right to liberal visitation with his or her child at reasonable times and under reasonable conditions.’ ” (citation omitted)). And in reality, it is pretty hard to deprive a parent of all visitation, as it should be. See, e.g., Michael Gerald D., 220 Md.App. at 680-85, 105 A.3d 578. As a third party, however, she must surmount a difficult burden before the court even reaches Jaxon’s best interests: she must prove that Brittany either is unfit or that extraordinary circumstances justify judicial intrusion into Brittany’s right to parent Jaxon. Compare McDermott v. Dougherty, 385 Md. 320, 869 A.2d 751 (2005) (holding that father’s absence from the life of his son, which occurred when father was out at sea for months at a time while employed as a merchant marine, did not constitute exceptional circumstances that would warrant transfer of child custody) with Koshko v. Haining, 398 Md. 404, 921 A.2d 171 (2007) (holding that grandparents petitioning for *388 visitation are first required to show prima facie evidence of parental unfitness or exceptional circumstances before a trial court applies the best interest of the child standard) and In re Victoria C., 437 Md. 567, 88 A.3d 749 (2014) (holding that sibling’s request for visitation was governed by the third-party visitation rule). That standard makes sense when the visitation request comes from a true third party, ie., from someone outside the nuclear family relationship that the divorce proceeding will divide.
At the risk of oversimplifying the obvious, the rights and obligations of parenthood have arisen historically from a person’s contribution of biological material at the time of conception, by marriage, or by legal adoption. The classic and easiest example has always been the married opposite-sex couple, but the law has developed ways of defining and assigning parental status irrespective of marriage altogether. Indeed, when the dispute relates to a child’s financial support, Maryland law provides a specific mechanism for determining “legitimacy,” a concept that extends the obligations (not rights, more on this below) of parenthood to parents (typically fathers) of children not born of a recognized marriage. See Md. Code (1984, 2012 Repl. Vol.), §§ 5-1005-48 of the Family Law Article (“FL”) (creating “Legitimation proceedings”).
But the definitions of parenthood tied to marriage, biology or formal adoption don’t map neatly onto same-sex relationships, especially same-sex relationships formed in the hundreds of years before our State (finally) recognized the rights of two men or two women to marry. And biology, at least as we now know it, prevents two men or two women from conceiving and birthing a child themselves. So same-sex couple-led families have had to adapt, and children become part of their families in a variety of ways. Some couples adopt. Some couples, like Brittany and Michelle, might have one become pregnant by artificial insemination; others might donate sperm and have a surrogate carry the baby to term. Of course, these same methods are available to opposite-sex couples too, and have been all along. See, e.g., Sieglein v. Schmidt, 224 Md.App. 222, 242-43, 120 A.3d 790, 802-03, 2015 *389 WL 5021392, at **9-10 (2015) (child conceived by in vitro fertilization or artificial insemination with consent and born during marriage is child of both spouses, even if sperm and egg both came from donors). From a legal perspective, though, differentiations between same-sex spouses on the basis of their relative biological roles will always disadvantage the spouse who didn’t contribute sperm, egg, or uterus.
Here, the couple decided to use donor sperm to impregnate Brittany, who carried and gave birth to Jaxon. That makes Brittany his biological mother and, out of the womb, his parent. His biological father was a sperm donor who relinquished any parental rights, a fertility mechanism known and understood in our law.
So, who is Michelle to Jaxon? It depends. From a practical, day-to-day perspective, evidence before the circuit court portrayed Michelle as Jaxon’s parent, at least for the first part of his life. Brittany and Michelle were together for seven years before they decided to have a child together. Michelle was involved in helping to select Jaxon’s sperm donor, someone with physical characteristics like hers. Jaxon’s full name includes both of their last names. They lived together as a family for the first seventeen months of Jaxon’s life, and both Jaxon and Brittany referred to Michelle in dad-like terms. Michelle also had visitation with Jaxon for nine months after they separated.
Legally, though, she doesn’t fit any of the historic paradigms. Had Michelle and Brittany been married at the time Jaxon was born, the case might be closer, but they weren’t; indeed, at the time he was conceived in 2009, they couldn’t marry in the District of Columbia, where they lived, or in Maryland, or anywhere other than Connecticut, Iowa, or Massachusetts.[4] Michelle probably could have adopted Jax- *390 on,[5] but hadn’t at the time their relationship fell apart, and Michelle testified that they couldn’t afford it. The closest analogy is that Michelle is Jaxon’s stepparent, but that doesn’t really work either—Jaxon did not come to the family along with Brittany from outside, but came into the world in the context of the relationship at issue in this divorce case.
Before same-sex couples could marry, our courts were asked to recognize the person in Michelle’s shoes here as a de facto parent—someone who did not fit the traditional definition of parent, but who had a connection with the child that justified a best interests analysis without a threshold finding of unfitness or extraordinary circumstances. This Court did so twice, first in S.F. v. M.D., 132 Md.App. 99, 751 A.2d 9 (2000), and again when Janice M. stopped here en route to the Court of Appeals. 171 Md.App. 528, 910 A.2d 1145 (2006). The Court of Appeals expressly declined to adopt de facto parenthood, however, in Janice M. v. Margaret K., 404 Md. 661, 948 A.2d 73 (2008). That case presented a nearly identical situation—a two-woman couple who brought a daughter into their family through adoption, and only one of whom was a legal adopting parent. When they split up, the non-adoptive woman sought visitation, and argued that she was the daughter’s de facto parent (on a record that supported visitation more unambiguously than this one). The Court’s reluctance *391 to recognize that status turned in large measure on the inability to limit the concept of de facto parenthood in a manner consistent with Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), McDermott, or Koshko:
The visitation dispute in this case arises in the context of two women. We are mindful of the extensive literature in the law reviews on the issue of visitation rights for same-sex partners when their relationships have terminated and especially the difficulties, in some states, that same-sex partners experience when custody or visitation is at issue. The issues inherent in this disagreement, however, are not limited to same-sex couples and could arise in a myriad of other circumstances, including disputes involving step-parents, grandparents, and parties in a relationship with “a significant other.” At oral argument, we inquired of the parties, whether the fact that the parties were of the same sex in the case before the Court should have any bearing on our analysis. Neither argued that it should. Janice M. would embrace a single test for all third parties and would give no special consideration to same-sex partners. Margaret K., when asked, also did not argue for a different test for same-sex couples. Indeed, she acknowledged that, while there is no explicit legal or statutory authority in Maryland for adoption under the circumstances presented herein, she could have petitioned to become a second-party adoptive parent to Maya.
404 Md. at 686, 948 A.2d 73 (emphasis added). The Court also distinguished the law of other states, most notably Minnesota, which had at that time recognized de facto parent visitation by statute. See id. at 686-89, 948 A.2d 73 (discussing SooHoo v. Johnson, 731 N.W.2d 815 (Minn.2007)).
Janice M.’s holding—that the non-biological, non-adoptive same-sex partner is a third party for custody purposes— compels us to hold here that Michelle is a third party to Jaxon for purposes of the visitation analysis, and thus that the circuit court did not err in concluding that it first had to find exceptional circumstances before considering Jaxon’s best interests. But the premise underlying Janice M’s rejection of *392 de facto parenthood—that the concept can’t be limited to same-sex couples—no longer holds, at least with regard to married same-sex couples. If, as Maryland law now provides, a valid marriage between two women (or two men) has the same legal validity and force as a man-woman marriage, courts should analyze the visitation rights of same-sex spouses the same way they analyze the visitation rights of opposite-sex spouses. I acknowledge that there may well be some challenges in adapting our analyses to accommodate the real-life differences in the way children join same-sex families, but it may not be that hard either,[6] and we have to start somewhere.
II.
I agree as well that Michelle cannot back into a finding of parenthood via FL § 5-1005 and Md. Code (1974, 2011 Repl. Vol.), § 1-208 of the Estates and Trusts Article (“ET”), statutes designed to establish paternity for the purposes of inheritance and financial support. I wonder, though, how the case might have come out if Brittany had sought financial support from Michelle and the court had analyzed Michelle’s “fatherhood” against the express legislative policy that it is “socially necessary and desirable” to secure the same support, care, and education for children born out of wedlock as those born within marriages. ET § 5-1002. Under ET § 1-208, Brittany would only need to prove that Michelle satisfied one of four potential indicia of “fatherhood,” and putting aside the gender discrepancy, the evidence before the circuit court could support a straight-face finding that Michelle satisfied three of them:
A child born to parents who have not participated in a marriage ceremony with each other shall be considered the child of his father only if the father:
*393 (1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings;
(2) Has acknowledged himself, in writing, to be the father;
(3) Has openly and notoriously recognized the child to be his child; or
(4) Has subsequently married the mother and has acknowledged himself, orally or in uniting, to be the father.
(Emphases added).
I don’t mean to conflate these notions of parenthood. My only point is the visceral one: if this divorce case had included a request by Brittany for child support from Michelle as well as the dispute over visitation, the court might well have faced the possibility that Michelle qualified as Jaxon’s “father” with regard to support but stood as a third party with regard to visitation. Or, perhaps, a finding of “fatherhood” for support purposes might have informed the court’s exceptional circumstances analysis. Either way, the greater potential for this sort of dichotomy in the context of a same-sex divorce confirms my instinct that the historic treatment of same-sex parenthood is no longer up to the task.

. I will follow the majority’s convention of referring to the parties by their first names, purely for clarity and meaning no disrespect.

. I agree with the majority that broader constitutional questions about the continuing validity of our State’s parenthood and child legitimacy statutes were neither raised nor decided in the circuit court, and therefore that we should not reach them.

. The pleadings don't address the fact that Brittany had custody of Jaxon, but Michelle admitted as much during the hearing and custody is not in dispute.

. Or The Netherlands, Belgium, Canada, Spain, South Africa, Norway, or Sweden. See “Gay Marriage Around The World,” Pew Research Center, Religion & Public Life, http://www.pewforum.org/2015/06/26/ gay-marriage-around-the-world-2013/, last visited August 14, 2015.
*390 The majority holds the couple’s failure to marry in another state before conception against them, but I wouldn’t. Michelle and Brittany had long been a couple when they decided to conceive and bring Jaxon into their home, and they could not have known with any confidence in 2009 whether the District of Columbia (or Maryland) ever would allow them to get married or recognize an out-of-state same-sex wedding from elsewhere.

. I say "probably” because although there is no statutory impediment to same-sex second-parent adoption, it appears that no holding of the Court of Appeals has recognized them—indeed, as recently as 2012, the Court has acknowledged that it hasn’t yet recognized them. Port v. Cowan, 426 Md. 435, 452 n. 19, 44 A.3d 970 (2012); see also Janice M., 404 Md. at 665 n. 3, 948 A.2d 73; but compare Conaway v. Deane, 401 Md. 219, 334-36, 932 A.2d 571 (2007) (Raker, J., concurring and dissenting) (expressing the view that FL § 5-3A-29 permits same-sex couples to adopt).

. See "Divorce—Whether Same-Sex Marital Infidelity Can Qualify As Adultery For Purposes of Family Law Provisions Governing Divorce,” 100 Op. Att’y Gen. 105 (July 24, 2015).