948 A.2d 73

**JANICE M.**

**v.**

**MARGARET K.**

No. 122 Sept. Term, 2006.

Court of Appeals of Maryland.

May 19, 2008.

662

Cynthia E. Young, Annapolis (Stephen A. Drazin, Columbia), on brief, for Petitioner/Cross-Respondent.

Jennifer F. Fairfax (Scott M. Strickler of Strickler, Sachitano & Hatfield, P.A., on brief), Bethesda, for Respondent/Cross-Petitioner.

Brief of Family Research Council as Amicus Curiae in support of Petitioner/Cross-Respondent: Matt M. Paavola, Baltimore, Benjamin W. Bull, Glen Lavy, Christopher R. Stovall, Alliance Defense Fund, Scottsdale, AZ.

Brief of Amici Curiae in support of Respondent/Cross-Petitioner Nat. Ass'n of Social Workers, Nat. Ass'n of Social Workers MD Chapter: Clara M. Martone-Boyce, Robyn L. Ginsberg, Kindall C. Burman, Latham & Watkins, LLP, Washington, DC; Barbara Bennett Woodhouse, Center on Children and Families, Frederic G. Levin College of Law, Gainesville, FL.

Brief of Amicus Curiae The Nat. Center for Lesbian Rights and The University of Baltimore School of Law and Family Mediation Clinics in support of Respondent/Cross-Petitioner: Shannon Minter, Vanessa Eisemann, Nat. Center for Lesbian Rights, San Francisco, CA; Jane Murphy, Leigh Goodmark, University of Baltimore Family Law Clinical Programs, Baltimore.

Brief of Amici Curiae American Civil Liberties Union, American Civil Liberties of Maryland, Nat. Center for Lesbian Rights, and Public Justice Center, in support of Respondent/Cross-Petitioner; Shannon Minter, Kendra Presswood, Nat. Center for lesbian Rights, San Francisco, CA; Suzanne Sangree, Public Justice Center, Baltimore; Leslie Cooper, James D. Esseks, American Civil Liberties Union Foundation, New York City; David R. Rocah, American Civil Liberties Union Foundation of Maryland, Baltimore.

ARGUED BEFORE BELL, C.J., RAKER *, CATHELL *, HARRELL, BATTAGLIA, GREENE, and ALAN M. WILNER (Retired, specially assigned), JJ.

BELL, Chief Judge.

We decide in this case whether Maryland recognizes *de facto* parenthood status and, if so, whether a person who satisfies the requirements of that status is entitled to visitation or custody rights over the objection of a fit, legal parent,[1] without having to establish that exceptional circumstances warranting such rights exist. We shall hold that *de facto* parenthood is not recognized in Maryland. Accordingly, we conclude, in order to overcome the constitutional rights of a legal parent to govern the care, custody, and control of his or her child, even a person who would qualify as a *de facto* parent, who seeks visitation or custody, must demonstrate exceptional circumstances as a prerequisite to the court's consideration of the best interests of the child as a factor in that decision.

In this case, one member of a committed same-sex relationship is seeking custody of, and/or visitation with, the child adopted by the other member of that relationship. Janice M., the petitioner, and Margaret K., the respondent, were involved in a committed same-sex relationship for approximately eighteen years, during the course of which Janice M. adopted Maya, for whose custody Margaret M. filed a complaint in the Circuit Court for Baltimore County. That court denied Margaret K.'s prayer for custody, but, having found that Margaret K. was a *de facto* parent, granted her visitation. The Court of Special Appeals affirmed that judgment. *Janice M. v. Marga-*

---

* Raker, J. and Cathell, J., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

1. The term "legal parent" refers to any party who is recognized as a parent by law. *See* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.03(a), at 107 (softcover ed. 2003). It includes both natural and adoptive parents.

*ret K.*, 171 Md.App. 528, 910 A.2d 1145 (2006). We granted Janice M.'s petition for writ of certiorari and Margaret K.'s cross petition to consider the standard a trial court should employ when considering visitation and custody matters under the circumstances presented by this case. *Janice M. v. Margaret K.*, 396 Md. 524, 914 A.2d 768 (2007).

## I.

Janice M. and Margaret K. are two women who were involved in a committed same-sex relationship. The couple met in 1986, and, for most of the approximately eighteen years they were together, they lived together in a residence owned by Janice M. In the summer of 2004, the parties separated and Margaret K. moved out of Janice M.'s home.

Janice M. desired very much to be a mother, a sentiment which she often expressed during the course of their relationship. When her attempts to become pregnant by use of *in vitro* fertilization proved unsuccessful and after discussing her options with Margaret K.,[2] Janice M. pursued adoption in India. That pursuit was successful; Janice M. adopted Maya, who, in December 1999, arrived in the United States. Margaret K. did not ever attempt to adopt Maya in Maryland.[3]

---

**2.** Margaret K. played no role in the formal adoption process. The record indicates that Indian adoption regulations prohibit same-sex couples from adopting and that Margaret K.'s failure to become involved in Maya's adoption may have been due, in part, to this fact.

**3.** The issue of whether same-sex couples may adopt a child in Maryland has not been briefed in this case and we express no opinion on the issue. Md.Code (1984, 2006 Repl.Vol.), § 5–3A–29 of the Family Law Article prescribes the requirements for adoption. In pertinent part, it provides:

"(a) Age.—Any adult may petition a court for adoption under this subtitle.

\* \* \*

"(c) Marital Status.—

(1) If a petitioner under this section is married, the petitioner's spouse shall join in the petition unless the spouse:
(i) is separated from the petitioner under a circumstance that gives the petitioner a ground for annulment or divorce; or
(ii) is not competent to join in the petition.

From the time that Maya arrived in the United States in 1999 until the summer of 2004, when the parties separated, she lived with both Margaret K. and Janice M. During that time, the parties shared most duties regarding Maya's care. Janice M. and Margaret K. divided the responsibilities for preparing Maya's food, changing her diapers, bathing her, handling her schooling, addressing her healthcare needs, and performing most other caretaking duties.

Following the parties' separation, Margaret K. initially saw Maya between three and four times a week. Those visits were largely unsupervised. As the relationship between Margaret K. and Janice M. increasingly became strained, Janice M. placed certain restrictions on Margaret K.'s visitation. In October 2004, Janice M. sent Margaret K. a letter in which she enumerated specific conditions on visitation, Margaret K.: was required to arrange visitation through Janice M. rather than with Maya directly; could take Maya only to places that Janice M. approved, could not speak disparagingly about Janice M., and was required to inform Janice M. of any people who would accompany Margaret K. during visits. Thereafter, Margaret K. continued unsupervised visitation with Maya approximately twice a week.

By January 2005, Margaret K. had become dissatisfied with the prescribed conditions, restrictions, on visitation. As a result, in that month, Margaret K.'s attorney sent Janice M. a letter concerning visitation with Maya. Janice M. responded by denying Margaret K. all visitation and prohibiting her all access to Maya.

Margaret K. filed a complaint in the Circuit Court for Baltimore County, seeking custody, or, in the alternative,

---

(2) If the marital status of a petitioner changes before entry of a final order, the petitioner shall amend the petition accordingly." Further, the Code of Maryland Regulations, COMAR 07.05.03.09(A)(2), prohibits an adoption agency from denying an individual's application to adopt because of the applicant's sexual orientation. *See also* COMAR 07.05.03.15(C)(2) (noting that the "agency may not delay or deny the placement of a child for adoption on the basis of ... sexual orientation").

visitation. At an evidentiary hearing on the complaint, Margaret K. testified about her relationship with Maya, as did several of the couple's friends and acquaintances. At the conclusion of Margaret K.'s case, the Circuit Court granted Janice M.'s motion for judgment on the issue of custody. As an initial matter, the court determined that Janice M., as an adoptive parent, was entitled to a presumptive right of custody. After finding "no evidence as to lack of fitness on the part of [Janice M.]," the court considered whether extraordinary circumstances existed to overcome the presumption that Janice M. was entitled to custody of Maya. The Circuit Court concluded as follows:

"As far as extraordinary circumstances, the circumstances have to be extraordinarily exceptional or compelling, such circumstances as require the court to remove the child from the biological parent in order to protect the child from harm.

"In reviewing *Karen v. Christopher,* 163 Md.App. 250, 878 A.2d 646 (2005), I think that case can be distinguished from the facts of this case. In that case the biological parent abruptly removed the child from the State of Maryland making it almost impossible for the person seeking custody, Christopher in that case, to communicate with them. The biological parent did not allow the child to see Christopher except infrequently with restrictions, including that visitation had to be in her presence.

"Basically, in that case the court found that the biological parent through a pattern of immaturity and selfishness in an effort to elevate her own personal interests took actions which actually rendered the child fatherless to break the bond totally between the father and child. In this case we do have some restrictions being set forth in this October 6th, 2004 letter, but I don't see that those restrictions are anywhere near the level of what was going on in the cited case.

"In fact, very clearly [Janice M.] is saying, I do not want to deny Maya the opportunity to see you. You have been allowed to communicate and visit with Maya each week,

etcetera, etcetera. I've encouraged her to call you, although she may not want to invite you to be part of our activities. It's because I love Maya, and I know that she cares about you that you have been granted the opportunity to visit with her.

\* \* \*

"So I think based on this letter anyhow there are rules being set forth, but you don't have a situation where the child is being taken out of state, and so I don't see that this establishes—I don't see where the facts of this case rise to the level of extraordinary, exceptional or compelling circumstances or even close. So I'm going to grant the motion as to custody, and we'll proceed on the visitation issues."

Following the conclusion of all the evidence, the Circuit Court addressed the issue of visitation, concluding that Margaret K. was entitled to visitation. Relying primarily on the Court of Special Appeals' decision in *S.F. v. M.D.*, 132 Md. App. 99, 751 A.2d 9 (2000), the court found that Margaret K. was Maya's *de facto* parent and, therefore, visitation would be in the best interests of Maya. The court reasoned:

"Under the case of *S.F. v. M.D.*, since we're dealing strictly with visitation right now, having already dismissed the issue of custody at the end of the plaintiff's case, I find that the plaintiff is a *de facto* parent under that case.

"The four factors are met. The first one being, did the legal parent consent to and foster the relationship between the third party and the child? Clearly, I believe [Janice M.] did do that.

"There's no question that the second prong is met. The third party must have lived with the child. [Margaret K.] lived with the child for about three and a half years I believe it was.

"The third factor, the third party must perform parental functions for the child to a significant degree. I think that's very clear from all the testimony.

\* \* \*

"And then the fourth factor, which the case says is the most important, is there a parent-child bond that had been forged? I think the evidence is clear that that's occurred as well.

\* \* \*

"So I find that the plaintiff is a *de facto* parent. Having found that in the context of visitation, there then is no presumption in favor of the biological parent, or here, the adoptive parent.

"So then you look at the best interests of the child, and the court finds as a matter of fact that it is in the best interests of the child that there be visitation with the plaintiff. It was not only her testimony, but it was also the testimony of the other witnesses that there is this relationship, and I'm finding that it would be detrimental that it be cut off totally."

Janice M. noted a timely appeal to the Court of Special Appeals. The intermediate appellate court affirmed the judgment of the Circuit Court and its finding that Margaret K. qualified as a *de facto* parent. The intermediate appellate court explained:

"In *S.F. v. M.D.*, 132 Md.App. 99, 751 A.2d 9 (2000), Judge James Eyler stated for this Court:

'In determining whether one is a de facto parent, we employ the test enunciated in *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995), and *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 (2000). Under that test, "the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged." . . . Consequently, . . . a non-biological, non-adoptive parent, . . . [who] is a *de facto* parent, . . . is not required to show unfitness of the biological parent or exceptional circumstances . . . [to be] entitled to visitation."

*Id.* at 111–12, 751 A.2d [at 15].

"The person who claims to be a child's *de facto* parent must successfully shoulder the burdens of (1) pleading, (2) production of evidence, and (3) persuasion. We can take judicial notice that in almost every home occupied by adults and children, the adults perform *some* parental functions on behalf of the children. Under the above quoted test, however, a person who performed parental functions is not entitled to *de facto* parent status unless the court finds as a fact that the child's legal parent has actually fostered such a relationship. Because the test we adopted in *S.F. v. M.D.*, *supra,* is a strict one, neither our holding in that case nor our holding in the case at bar will open the floodgates to claims of *de facto* parenthood asserted by persons who can prove nothing more than that, while living with the natural or adoptive parent of a child, they performed some parental functions on behalf of the child.

"Rare are the cases like the case at bar, in which the circuit court was presented with evidence that (as summarized in the argument of Margaret K.'s counsel) 'Maya was with Margaret K. every day of her life in this country until August of 2004 [and] [t]he only reason that Margaret K. has been deprived of the opportunity to have a relationship with her daughter is because she wasn't on that decree of adoption.' Under these circumstances, there is no merit in Janice M.'s argument that the evidence presented to the circuit court was insufficient to support the factual finding that Margaret K. is Maya's *de facto* parent."

*Janice M. v. Margaret K.,* 171 Md.App. 528, 538–40, 910 A.2d 1145, 1152 (2006). The Court of Special Appeals also affirmed the Circuit Court's "holding that 'a non-biological, non-adoptive parent, . . . [who] is a *de facto* parent, . . . is not required to show unfitness of the biological parent or exceptional circumstances . . . [to be] entitled to visitation.' " *Id.* at 530, 910 A.2d at 1146–47 (quoting *S.F.,* 132 Md.App. at 111–12, 751 A.2d at 15).

Janice M. petitioned this Court for a writ of certiorari, which we granted to address the following question:

"Does an exceptional circumstances standard rather than a best interests standard apply to visitation with a *de facto* parent?"

We also granted Margaret K.'s cross-petition, which sought resolution of the following questions:

"1. Must a *de facto* parent prove that a legal parent is unfit or that exceptional circumstances exist for the *de facto* parent to obtain custody of his or her *de facto* child?

"2. Is a *de facto* parent entitled to visitation with his or her *de facto* child if it is in the child's best interest?"

*Janice M. v. Margaret K.,* 396 Md. 524, 914 A.2d 768 (2007).

## II.

The United States Supreme Court long has recognized that the Due Process Clause of the Fourteenth Amendment protects the rights of parents to direct and govern the care, custody, and control of their children. *See Troxel v. Granville,* 530 U.S. 57, 69–70, 120 S.Ct. 2054, 2062, 147 L.Ed.2d 49, 58–59 (2000); *Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1078 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399–401, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042, 1044–46 (1923). In *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49, writing for the plurality, Justice O'Connor explained as follows:

"The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.' We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, guarantees more than fair process. The Clause also includes a substantive component that provides heightened protection against government interferences with certain fundamental rights and liberty interests.

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401[, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042, 1044–46] (1923), we held that the 'liberty' protected by the Due Process Clause includes the right of parents 'to establish a home and bring up children' and 'to control the education of their own.' Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535[, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1078] (1925), we again held that the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control.' We explained in *Pierce* that '[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' *Id.*, at 535[, 45 S.Ct. at 573, 69 L.Ed. at 1078]. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158[, 64 S.Ct. 438, 88 L.Ed. 645] (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. 'It is cardinal with us that the custody, care and nurture of the child resides first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Id.*, at 166[, 64 S.Ct. at 442, 88 L.Ed. at 652].

"In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."

*Troxel*, 530 U.S. at 65–66, 120 S.Ct. at 2059–60[, 147 L.Ed.2d at 56–57] (some internal citations and quotations omitted).

In *Troxel*, the issue before the Supreme Court was the constitutionality of a Washington statute permitting "any third

party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." *Id.* at 67, 120 S.Ct. at 2061[,147 L.Ed.2d at 57]. The respondent, a mother of two children, wanted to limit her children's visits with their grandparents, the parents of the children's deceased father. The trial court ordered visitation over the mother's objection. The Washington intermediate appellate court reversed and the Washington Supreme Court affirmed in a consolidated opinion, *In re Custody of Smith*, 137 Wash.2d 1, 969 P.2d 21 (1998). The Washington Supreme Court held the statute invalid on its face on several grounds. First, the court held that the Constitution permits a State to interfere with the right of parents to rear their children only to prevent harm or potential harm to a child and that the statute failed that standard because it required no threshold showing of harm. *Id.* at 29. Second, the court concluded that the visitation statute swept too broadly, by allowing " 'any person' to petition for forced visitation of a child at 'any time,' with the only requirement being that the visitation serve the best interest of the child." *Id.* at 30. The Washington Supreme Court opined that "parents have a right to limit visitation of their children with third persons," and that, as between parents and judges, "the parents should be the ones to choose whether to expose their children to certain people or ideas." *Id.* at 31.

The United States Supreme Court, in a plurality opinion, affirmed, holding that the Washington statute interfered with the mother's "fundamental right to make decisions concerning the care, custody, and control of her" children. *Troxel,* 530 U.S. at 72, 120 S.Ct. at 2063[, 147 L.Ed.2d at 60]. The plurality noted three important factors. First, the trial court had failed to honor the "traditional presumption that a fit parent will act in the best interest of his or her child." *Id.* at 68, 120 S.Ct. at 2061[, 147 L.Ed.2d at 59]. Second, the trial court erred in failing to give "special weight" to the mother's determination of her children's best interest. *Id.* at 69, 120 S.Ct. at 2062 [, 147 L.Ed.2d at 58]. Finally, the plurality gave weight to the fact that the children's mother never sought to

eliminate visitation with the grandparents, but instead attempted only to restrict the frequency of visits. *Id.* at 71, 120 S.Ct. at 2062–63[, 147 L.Ed.2d at 60].

The plurality declined to define the precise scope of the parental due process right in the visitation context and declined to answer the question of whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm. *Id.* at 73, 120 S.Ct. at 2064, 147 L.Ed.2d at 61. Instead, the Court rested its holding on the sweeping breadth of the Washington statute, stating as follows:

> "In this respect, we agree with Justice Kennedy that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best 'elaborated with care.' Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter."

*Id.* (internal citations omitted).

Since *Troxel,* this Court, on several occasions, has addressed a parent's due process rights in the context of custody or visitation. In *McDermott v. Dougherty,* 385 Md. 320, 869 A.2d 751 (2005), we resolved a custody dispute between a child's father, McDermott, and the child's maternal grandparents, the Doughertys. McDermott and the child's mother had divorced shortly after the child's birth. Initially, the child's mother had primary custody. The mother was unable to continue as custodian, however, when she was sentenced to incarceration. During her time in prison, she placed the child in the care of her parents. McDermott, who was on a six-month tour of duty as a merchant seaman, initially consented to this arrangement. Upon McDermott's return from sea, however, he sought custody of the child. A custody battle ensued between McDermott and the grandparents.

The Circuit Court awarded custody to the grandparents. The court concluded that the child's mother was unfit to have

custody, and that, while not "unfit," the father was not entitled to custody, it having also determined "that his employment in the merchant marine, requiring him to spend months-long intervals at sea, constituted 'exceptional circumstances' as that term was defined in *Ross v. Hoffman*, 280 Md. 172, 191, 372 A.2d 582, 593 (1977) ... and the 'best interest of the child' and need for a stable living situation thus warranted that custody be placed with the Doughertys," *McDermott*, 385 Md. at 324, 869 A.2d at 753. The Court of Special Appeals affirmed. We granted McDermott's petition for a writ of certiorari to determine when and under what circumstances, where a fit parent and a third party both are seeking custody, it is appropriate t o award custody to the third party.

We identified three circumstances in which the "best interest of the child" standard might arise. The first category involves disputes between fit legal parents, each of whom has equal constitutional rights to parent. The second, and most frequent situation, is in the various types of state proceedings in which the state injects itself into the parenting situation in the role of *parens patriae*, to protect the child. The third category consists of the third party custody dispute cases, *i.e.*, those cases in which persons other than legal parents or the State attempt, directly or indirectly, to gain or maintain custody or visitation in respect to the children of legal parents.[4] As to this category, where the focus is on the standard to be applied when the dispute is between a fit parent and a private third party, we explained:

> "Where the dispute is between a fit parent and a private third party ... both parties do not begin on equal footing in respect to rights to 'care, custody, and control' of the children. The parent is asserting a fundamental constitutional right. The third party is not. A private third party

---

4. We noted that within the third party subset of custody actions, some states have recognized the status of psychological parents, *i.e.*, third parties who have, in effect, become parents. *McDermott v. Dougherty*, 385 Md. 320, 356, 869 A.2d 751, 772 (2005) We noted that courts recognizing this status consider the issues according to the standards that apply between legal parents. *Id.*

has no fundamental constitutional right to raise the children of others. Generally, absent a constitutional statute, the non-governmental third party has no rights, constitutional or otherwise, to raise someone else's child."

*Id.* at 353, 869 A.2d at 770. We concluded that before the trial court may consider "the best interest of the child" test in deciding a custody dispute between fit parents and a third party, the trial court must first find the legal parents unfit to have custody or extraordinary circumstances that could result in serious detriment to the child if that child were to remain in the custody of the parents. *Id.* at 374–75, 869 A.2d at 783.

The trial court in *McDermott* did not find that the father was an "unfit" parent. Accordingly, the only issue to be resolved was whether extraordinary circumstances existed to justify granting custody to the grandparents.[5] After noting that it is presumed that fit parents act in the best interests of their children and that a third party seeking custody bears the burden of demonstrating exceptional circumstances, we held that the grandparents had failed to establish the exceptional circumstances necessary to justify awarding them custody. *Id.* at 424–25, 869 A.2d at 812–13. The Circuit Court's finding of exceptional circumstances was based on the father's extended periods at sea. *Id.* at 324, 869 A.2d at 753. The time McDermott spent at work, involuntarily spent away from his child because of the nature of his employment, was insufficient to establish the exceptional circumstances necessary to award custody to a third party, over his objection.[6] *Id.* at 431–32, 869 A.2d at 816.

---

5. In *McDermott*, we held:
   "[U]nder circumstances in which there is no finding of parental unfitness, the requirements of a parent's employment, such that he is required to be away at sea, or otherwise appropriately absent from the State for a period of time, and for which time he or she made appropriate arrangements for the care of the child, do not constitute 'extraordinary or exceptional circumstances' to support the awarding of custody to a third party."
   385 Md. at 325–326, 869 A.2d at 754 (Md.,2005).

6. Significantly, and appropriately, the grandparents seeking custody in *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005), were

The bottom line in *McDermott* is that, "absent a showing of parental unfitness or exceptional circumstances, 'the constitutional right [of parents to the 'care, custody, and control' of their children] is the ultimate determinative factor. . . . ' " *Koshko v. Haining*, 398 Md. 404, 419, 921 A.2d 171, 180 (2007) (quoting *McDermott*, 385 Md. at 418, 869 A.2d at 808). Having concluded that an examination of whether exceptional circumstances exist should precede, and determine the need for, a best interest analysis, we reiterated factors set out originally in *Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977), which may be probative in determining the existence of exceptional circumstances:

> "[1] length of time the child has been away from the biological parent, [2] the age of the child when care was assumed by the third party, [3] the possible emotional effect on the child of a change of custody, [4] the period of time which elapsed before the parent sought to reclaim the child, [5] the nature and strength of the ties between the child and the third party custodian, [6] the intensity and genuineness of the parent's desire to have the child, [7] the stability and certainty as to the child's future in the custody of the parent."

*McDermott*, 385 Md. at 419, 869 A.2d at 809 (quoting *Hoffman*, 280 Md. at 191, 372 A.2d at 593).

In *Koshko v. Haining*, 398 Md. 404, 419, 921 A.2d 171, 180 (2007), we revisited the due process rights of fit parents to control the upbringing of their children. That case differed from *McDermott* in that the dispute arose when the children's grandparents sought visitation, rather than custody, over the objections of the natural parents. Relying on Maryland's Grandparent Visitation Statute, Md.Code (1984, 2006 Rep. Vol.) § 9–102 of the Family Law Article, the Circuit Court granted visitation to the grandparents. We noted initially that Maryland's grandparent visitation statute, "simply provides that grandparents may petition for 'reasonable visitation'

---

considered "third parties" and treated as such in the analysis as to whether they were entitled to custody.

and empowers equity courts to grant such petitions if grand-parental visitation is 'in the best interests of the child.'" *Koshko,* 398 Md. at 424, 921 A.2d at 182. In order to save the statute from constitutional infirmity, we read into the statute a presumption that parental decisions regarding their children are valid, both as mandated by substantive due process and Maryland common law. *Id.* at 426, 921 A.2d at 184. We concluded:

> "To preserve fundamental parental liberty interests, we now apply a gloss to the Maryland GVS [Grandparent Visitation Statute] requiring a threshold showing of either parental unfitness or exceptional circumstances indicating that the lack of grandparental visitation has a significant deleterious effect upon the children who are the subject of the petition. We do so under the principle of constitutional avoidance previously invoked in this opinion to engraft onto the GVS a parental presumption."

*Id.* at 441, 921 A.2d at 192–93.

As a visitation, rather than a custody, case, *Koshko* addressed the relationship between custody and visitation, and the principles to be applied in determining visitation between the legal parents and grandparents. We pointed out that "visitation is a species of custody, *albeit* for a more limited duration." *Id.* at 429, 921 A.2d at 185. We explained:

> "There is no dispute that the grant or *modification* of visitation involves a lesser *degree* of intrusion on the fundamental right to parent than the assignment of custody. We except from this notion, however, that, because of this conceptualization, visitation somehow ranks lower on the 'scale of values' such that its determination does not require the application of stringent tests as is the case with custody. In other words, although there may be a difference in the degree of intrusion, it is not a difference of constitutional magnitude. Visitation, like custody, intrudes upon the fundamental right of parents to direct the 'care, custody, and control' of their children. Though visitation decisions granting such privileges to third parties may tread more lightly

into the protected grove of parental rights, they tread nonetheless."

*Koshko,* 398 Md. at 430–31, 921 A.2d at 186 (internal footnotes omitted). We made clear that visitation matters deserve no less scrutiny than custody matters, any language from previous decisions to the contrary notwithstanding, which language we disapproved, in the process. *Id.* at 431, 921 A.2d at 186. Citing *Troxel,*[7] we stated that, "[f]or the purposes of constitu-

---

7. Our holding in *Koshko v. Haining,* 398 Md. 404, 921 A.2d 171 (2007), was not based solely on the Supreme Court's decision in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), or federal due process considerations. It was based also on Article 24 of the Maryland Declaration of Rights. We stated as follows:

"We are aware that the plurality opinion in *Troxel* does not compel our holding in this regard in the present case. 530 U.S. at 73, 120 S.Ct. at 2064 [, 147 L.Ed.2d at 61]. The result reached here illustrates the notion that the extent of protection bestowed upon liberty interests recognized as being enshrined within the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution does not dictate necessarily the full compliment of safeguards extended to liberty interests available under the Maryland due process analog found in Article 24 of the Maryland Declaration of Rights."

*Koshko,* 398 Md. at 443–44, 921 A.2d at 194. We continued:

"Our precedent states clearly that the Maryland and Federal due process provisions have been read *'in pari materia.'* *Pickett v. Sears, Roebuck & Co.,* 365 Md. 67, 77, 775 A.2d 1218, 1224 (2001); *Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052, 1056 (1980); *Allied Am. Mut. Fire Ins. Co. v. Comm'r of Motor Vehicles,* 219 Md. 607, 615–16, 150 A.2d 421, 426–27 (1959). This principle of reading the provisions in a like manner does not, however, reduce our analysis to a mere echo of the prevailing Fourteenth Amendment jurisprudence. *Aero Motors, Inc. v. Motor Vehicle Admin.,* 274 Md. 567, 587, 337 A.2d 685, 699 (1975) ('Although Art. [24] of the Maryland Declaration of Rights has long 'been equated' with the 'due process' clause of the Fourteenth Amendment by judicial construction and application, the two provisions are not synonymous.'); *see also* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights,* 90 Harv. L.Rev. 489, 491 (1977) ('[S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed.'). We have not hesitated, where deemed appropriate, to offer a different interpretation of the Maryland provision. For example, *see Dua v.*

tional analysis, parental autonomy is encroached upon equally by visitation matters as it is with custody disputes when the state interference is 'direct and substantial.' " *Id.* at 434, 921 A.2d at 189. *McDermott* made clear that parental unfitness and exceptional circumstances are threshold considerations in third party custody determinations; *Koshko* made clear that those considerations apply in third party visitation disputes. Because we decided that the grandparent visitation statute had been unconstitutionally applied to the Koshkos in the absence of a threshold finding of parental unfitness or exceptional circumstances, we remanded the case to the Circuit Court for further proceedings consistent with our opinion.

## III.

With this aspect of our custody and visitation jurisprudence as background and firmly in mind, we turn to the issue presented in this case—whether, when the party asserting visitation rights meets the requirements for de facto parent status, a court, without first finding exceptional circumstances or parental unfitness, may apply the best interests of the child standard.

The term "*de facto* parent" has a literal meaning, "parent in fact." It is used generally to describe a party who claims custody or visitation rights based upon the party's relation-

---

*Comcast Cable of Maryland, Incorporated,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) (cataloguing cases). *See also Borchardt v. State,* 367 Md. 91, 175, 786 A.2d 631, 681 (2001) (Raker, J., dissenting) ('Although this Court has generally interpreted Article 24 *in pari materia* with the Due Process Clause of the Fourteenth Amendment, we have interpreted it more broadly in instances where fundamental fairness demanded that we do so.'). Judge Raker's dissent in *Borchardt* cited some examples in the criminal context, such as placing stricter limits on prosecutorial discretion to enter *nolle prosequi* and the optional merger of criminal offenses. *Id.* We have also read Maryland's due process clause more broadly than the federal constitution in granting the right to counsel, *see Rutherford v. Rutherford,* 296 Md. 347, 358, 363, 464 A.2d 228, 234, 237 (1983), cited in *Das v. Das,* 133 Md.App. 1, 28, 754 A.2d 441, 456 (2000), and the protection from self-incrimination, *Choi v. State,* 316 Md. 529, 535 n. 3, 560 A.2d 1108, 1111 n. 3 (1989)."
*Koshko,* 398 Md. at 444 n. 22, 921 A.2d at 194–95 n. 22.

ship, in fact, with a non-biological, non-adopted child.[8] The American Law Institute, which has promulgated principles governing the allocation of custodial and decision-making responsibilities for children, defines *de facto* parent as follows:

"[A]n individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,

"(i) lived with the child and,

"(ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions,

"(A) regularly performed a majority of the caretaking functions for the child, or

"(B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived."

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.03(1)(c), at 107–08 (softcover ed. 2003).

Relying on *S.F. v. M.D.*, 132 Md.App. 99, 751 A.2d 9, the trial judge in the instant case found that Margaret K. is Maya's *de facto* parent and, therefore, granted Margaret K. visitation. Janice M. urges this Court to reject the concept of *de facto* parenthood as it may bear on custody or visitation

---

**8.** Often the term *"de facto* parent" is used interchangeably with the terms *in loco parentis* and/or "psychological parent." *See In re Parentage of L.B.*, 155 Wash.2d 679, 122 P.3d 161, 167–68 n. 7 (2005). While these designations are related, they are not always, or necessarily, identical in meaning. *"In loco parentis"* literally means "in the place of a parent," and refers to a party "[a]cting as a temporary guardian of a child." BLACK's LAW DICTIONARY 791 (7th ed. 1999). The term "psychological parent" is based primarily in social science theory, and refers to a party who has a "parent-like" relationship with a child as a result of "day-to-day interaction, companionship, and shared experiences." JOSEPH GOLDSTEIN, ANNA FREUD, ALBERT J. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD, 19, The Free Press, Simon & Schuster, Inc. (1973).

determinations, overrule *S.F. v. M.D.*, and hold that all persons other than legal parents are to be treated as third parties, as our holdings in *McDermott* and *Koshko* suggest, if not direct. Under Janice M.'s interpretation of *McDermott* and *Koshko*, a *de facto* parent is entitled to no greater consideration than any other non-parent, biological or adoptive, and, thus, should, or would, be treated no differently than any other third party. Consequently, before the best interest of the child factors may be considered in a visitation case between a legal parent and a *de facto* parent, the trial court would need to find that the legal parent is unfit to have custody or that there are extraordinary circumstances posing serious detriment to the child if that child were to remain in the custody of the legal parent.

Janice M. argues that all third parties, including those that qualify as *de facto* parents under the standard enunciated by Court of Special Appeals, must demonstrate either that a legal parent is unfit or that extraordinary circumstances exist to justify granting that third party visitation rights over the legal parent's objections. According to Janice M., because the Circuit Court found her to be a fit parent, the only way that court properly could have required visitation over her objection was by finding extraordinary circumstances. Because the court stated explicitly that extraordinary circumstances did not exist, she contends that the court erred in granting visitation to Margaret K. Janice M. contends that the liberty interest of a parent in controlling the upbringing of her child mandates that conclusion and, moreover, requires the result she seeks.

Margaret K. responds that, once a court has determined that a person is a *de facto* parent, it has in fact, found the exceptional circumstances necessary to grant either visitation or custody. Indeed, she argues that the Court of Special Appeals' test demonstrates extraordinary circumstances and, therefore, that the Circuit Court was correct to grant her visitation on the basis of the best interests of the child standard. Margaret K. argues also that there is no constitutional bar to the analysis in which the Circuit Court and the

intermediate appellate court engaged or to the determination that they reached. In fact, she continues, the *de facto* parent-hood standard is necessary to protect a child's constitutional interest in maintaining a relationship with her *de facto* parent.

■ This Court has not yet addressed the concept of *de facto* parenthood in the context of either a custody or visitation dispute. Accordingly, we have never determined what legal status, if any, a person has vis-a-vis a non-biologically related or non-adopted child, with whom he or she has established a relationship meeting the requirements of a *de facto* parent, whether, in other words, such a person must demonstrate that a legal parent is unfit or that exceptional circumstances exist to justify custody or visitation rights, when the parent objects.

As we have seen, the Court of Special Appeals has considered the concept, as well as the status, of a de facto parent in the context of visitation rights in the case of *S.F. v. M.D.,* 132 Md.App. 99, 751 A.2d 9 (2000). It did so, however, prior to the Supreme Court's decision in *Troxel,* and our decisions in *McDermott* and *Koshko.* That case was a dispute between two women, S.F., and M.D., who had lived together in a committed domestic relationship for six years, from 1991 until 1997. While their relationship was on-going, M.D. gave birth to a child, conceived by means of artificial insemination. The parties separated three years thereafter. Following the separation, M.D. denied S.F. visitation with the child. S.F. responded by filing suit for custody, or, in the alternative, visitation. The trial court found that S.F. was entitled to neither, and S.F. noted a timely appeal to the Court of Special Appeals, in which she challenged the court's ruling on the issue of visitation.

The Court of Special Appeals observed, as a threshold matter, that a third party seeking custody will prevail only if that party demonstrates that a legal parent is unfit or that exceptional circumstances exist. *Id.* at 110–111, 751 A.2d at 15. The intermediate appellate court held, however, that neither showing is necessary to grant visitation where the .

third party is a *de facto* parent to the child.[9]  *Id.* at 111–12, 751 A.2d at 15. After acknowledging that "the Supreme Court of the United States and the Court of Appeals of Maryland have recognized that a natural parent has a fundamental right regarding the care and custody of his or her child," *id.* at 109, 751 A.2d at 14, the Court of Special Appeals determined that "[n]evertheless, the best interest of the child may take precedence over a parent's liberty interests in a custody, visitation, or adoption dispute." *Id.*  Expressing uncertainty "as to the character of the parental right at stake when the issue involves visitation rights rather than custody or the termination of parental rights," *id.* (quoting *Wolinski v. Browneller,* 115 Md.App. 285, 302, 693 A.2d 30, 38 (1997)), the court concluded that "a natural parent does not have a constitutional right to deny all visitation, if visitation would be in the best interest of the child." *S.F.,* 132 Md.App. at 109, 751 A.2d at 14.

To determine whether a person is a de facto parent, the Court of Special Appeals adopted the test set out by the Wisconsin Supreme Court in *In re Custody of H.S.H–K.,* 193 Wis.2d 649, 533 N.W.2d 419 (1995), and the New Jersey Supreme Court in *V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539 (2000).  Under the Wisconsin and New Jersey test, the establishment of *de facto* parenthood requires a petitioner to prove the following four elements:

> "(1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation [a petitioner's contribution to a child's support need not

---

9. *S.F. v. M.D.,* 132 Md.App. 99, 751 A.2d 9 (2000) is of limited usefulness to appellee's argument that a *de facto* parent is a unique status because the Court of Special Appeals concluded in *S.F.* that "a de facto parent, such as appellant, is a third party."  132 Md.App. at 114, 751 A.2d at 16.

be monetary]; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature."

*V.C.*, 748 A.2d at 551 (quoting *In re Custody of H.S.H–K.*, 533 N.W.2d at 421). Applying that test, the Court of Special Appeals concluded that because S.F. qualified as a *de facto* parent, she was not required to show unfitness of the biological parent or the existence of exceptional circumstances making an award of visitation rights in the child's best interest. *S.F.*, 132 Md.App. at 111–12, 751 A.2d at 15.

We will not recognize *de facto* parent status, as set forth in *S.F.*, as a legal status in Maryland. We refuse to do so because, even *assuming arguendo* that we were to recognize such a status, short-circuiting the requirement to show unfitness or exceptional circumstances is contrary to Maryland jurisprudence, as articulated in *McDermott* and *Koshko.*

Even were we to recognize some form of *de facto* parenthood, the real question in the case *sub judice* will remain, whether, in a custody or visitation dispute, a third party, non-biological, non-adoptive parent, who satisfies the test necessary to show de facto parenthood should be treated differently from other third parties. We have not been persuaded that they should be. In other words, where visitation or custody is sought over the objection of the parent, before the best interest of the child test comes into play, the *de facto* parent must establish that the legal parent is either unfit or that exceptional circumstances exist. A fair reading of *McDermott* and *Koshko* leads to no other conclusion. We reiterate what we said in *McDermott:*

"In the balancing of court-created or statutorily-created 'standards,' such as 'the best interest of the child' test, with fundamental constitutional rights, in private custody [and visitation] actions involving private third-parties where the parents are fit, absent extraordinary (*i.e.,* exceptional) circumstances, the constitutional right is the ultimate determinative factor; and only if the parents are unfit or extraordi-

nary circumstances exit is the 'best interest of the child' test to be considered . . . ."

*McDermott*, 385 Md. at 418–19, 869 A.2d at 808–09. Clearly, in light of *McDermott* and *Koshko*, S.F. no longer reflects Maryland law, and accordingly, is overruled.

The visitation dispute in this case arises in the context of two women. We are mindful of the extensive literature in the law reviews on the issue of visitation rights for same-sex partners when their relationships have terminated and especially the difficulties, in some states, that same-sex partners experience when custody or visitation is at issue. The issues inherent in this disagreement, however, are not limited to same-sex couples and could arise in a myriad of other circumstances, including disputes involving step-parents, grandparents, and parties in a relationship with "a significant other." At oral argument, we inquired of the parties, whether the fact that the parties were of the same sex in the case before the Court should have any bearing on our analysis. Neither argued that it should. Janice M. would embrace a single test for all third parties and would give no special consideration to same-sex partners. Margaret K., when asked, also did not argue for a different test for same-sex couples. Indeed, she acknowledged that, while there is no explicit legal or statutory authority in Maryland for adoption under the circumstances presented herein, she could have petitioned to become a second-party adoptive parent to Maya.

We are mindful as well that several of our sister states have created third party visitation statutes that grant *de facto* parents visitation despite objections from the legal parents. *See SooHoo v. Johnson*, 731 N.W.2d 815 (Minn.2007); *Rubano v. DiCenzo*, 759 A.2d 959 (R.I.2000). In *SooHoo*, 731 N.W.2d 815, the Minnesota Supreme Court considered such a statute, Minn.Stat. § 257C.08, subd. 4 (2006).[10] Determining that the

---

10. Minn.Stat. § 257C.08, subd. 4 (2006) provides:

"*If child has resided with other person.* If an unmarried minor has resided in a household with a person, other than a foster parent, for two years or more and no longer resides with the person, the person

statute was constitutional on its face, 731 N.W.2d at 818, the court upheld the trial court's decision to grant visitation to a third party, who stood *in loco parentis* to the children who were the subject of the visitation action, over the objections of the children's adoptive mother.

The Minnesota statute permits a court to grant reasonable visitation to a person with whom the child has resided for at least two years. The dispute in *SooHoo* arose after two women, SooHoo and Johnson, ended a long-term same-sex relationship. The couple's relationship lasted twenty-two years and, prior to their separation, they had lived together in a home they owned jointly. During that time, Johnson adopted two children from China. SooHoo did not attempt to adopt either child. The Minnesota Supreme Court noted, however, that "Johnson and SooHoo co-parented the children, recognized themselves as a family unit with two mothers, and represented themselves to others as such." *SooHoo*, 731 N.W.2d at 818.

Following the couple's separation, SooHoo petitioned for sole physical and legal custody of the children or, in the alternative, visitation. The trial court awarded visitation under Minnesota's third party visitation statute, Minn.Stat. § 257C.08, subdivision 4 (2006). The Minnesota Supreme Court affirmed, holding the statute constitutional. *SooHoo*, 731 N.W.2d at 821. Applying strict scrutiny analysis, the Court noted initially that the government possesses a compelling interest in "promoting relationships among those in recognized family units (for example, the relationship between a

---

may petition the district court for an order granting the person reasonable visitation rights to the child during the child's minority. The court shall grant the petition if it finds that:

"(1) visitation rights would be in the best interests of the child;

"(2) the petitioner and child had established emotional ties creating a parent and child relationship; and

"(3) visitation rights would not interfere with the relationship between the custodial parent and the child.

"The court shall consider the reasonable preference of the child, if the court considers the child to be of sufficient age to express a preference."

child and someone *in loco parentis* to that child) in order to protect the general welfare of children." *Id.* at 822. Viewing the statute as a narrowly tailored one, the Court stated:

"[W]e note that section 257C.08, subdivision 4, is, on its face, more narrowly drawn than the Washington statute at issue in *Troxel.* The Washington statute allowed courts to award visitation to any person at any time so long as it was in the child's best interests. In contrast, section 257C.08, subdivision 4, limits the class of individuals who may petition for visitation to those persons who have resided with the child for two years or more (excluding foster parents). In addition to that threshold requirement, the statute further narrows the class of those who may be awarded visitation to petitioners who have 'established emotional ties creating a parent and child relationship.' Minn.Stat. § 257C.08, subd. 4(2). We read this requirement as mandating that the petitioner stand in loco parentis with the child.... Therefore, unlike the statute at issue in *Troxel,* the requirements that the petitioner have resided with the child for two or more years and have a parent-child relationship with the child substantially limits the class of individuals who may successfully petition for visitation." [11]

*SooHoo,* 731 N.W.2d at 822–23. The Court held:

"Because Minn.Stat. § 257C.08, subd. 4, limits the class of individuals who may be granted third-party visitation to those who have a longstanding parent-child relationship with the child and prohibits the district court from granting visitation if the visitation is not in the child's best interest or interferes with the custodial parent's relationship, and because we conclude that the petitioner has the burden of proof by clear and convincing evidence, we also conclude

---

11. The Minnesota Supreme Court did strike down, as unconstitutional, subd. 7 of Minn.Stat. § 257C.08 (2006). That portion of the statute was constitutionally deficient because it failed to place the burden of proof on the party seeking visitation. The Court opined that the petitioner seeking visitation is required to prove the requirements of subd. 4 of Minn.Stat. § 257C.08 (2006) by clear and convincing evidence. *SooHoo v. Johnson,* 731 N.W.2d 815, 824 (Minn.2007).

that it is narrowly drawn to the state's compelling interest in protecting the general welfare of children by preserving the relationships of recognized family units. We therefore hold that Minn.Stat. § 257C.08, subd. 4, is not unconstitutional on its face."

*SooHoo*, 731 N.W.2d at 824.

Whether the Maryland General Assembly chooses to enact legislation similar to the Minnesota statute at issue in *SooHoo* is within its prerogative, of course, and we express no view, in the abstract, as to any such statute's constitutionality, either under the federal constitution or under Article 24 of the Maryland Declaration of Rights.

■ Margaret K. maintains, on the other hand, that this Court has recognized *de facto* parenthood status as a subset of exceptional circumstances. Citing *Monroe v. Monroe*, 329 Md. 758, 621 A.2d 898 (1993), she argues that the putative father in that case satisfied the requirements for exceptional circumstances because he was a de facto parent. Margaret K. misreads *Monroe*. In *Monroe*, we determined that there was ample evidence to support a finding of the exceptional circumstances necessary to overcome the legal parent's presumptive right to control her child's upbringing. We did not determine or conclude that a person who qualifies as a *de facto* parent is not required, *per se*, to establish exceptional circumstances.

In *Monroe*, the mother and putative father of a child, Beth, were involved in a custody dispute following their divorce. The putative father, who had not been married to Beth's mother at the time of conception, and, therefore, was not presumptively the child's father, had believed he was Beth's biological father from the time of her birth. That he was not Beth's presumptive father became important during the custody dispute, when Beth's mother sought, and the putative father submitted to, a blood test, which proved he was not the child's biological father. The putative father nevertheless sought custody, and the master presiding over the evidentiary hearing recommended that the putative father be awarded temporary custody of Beth. Both parties noted exceptions to

the master's recommendation. The putative father challenged the admissibility of the blood test, and the biological mother challenged the custody recommendation. The Circuit Court rejected the master's findings and found, as a matter of law, that exceptional circumstances did not exist to overcome the presumption that the child's best interests were served by remaining with her biological mother.

On appeal, this Court reiterated the well-settled proposition that, as a third party, Beth's putative father was entitled to custody only if exceptional circumstances existed to rebut the presumption that custody belonged with the fit biological parent. *Id.* at 773–74, 621 A.2d at 905. We then reversed the trial court's finding that exceptional circumstances had not been shown, holding, instead, that "there was ample evidence to support the master's determination that exceptional circumstances existed in this case to rebut the presumption that Beth's best interests lay with being in the custody of her mother." *Id.* at 777, 621 A.2d at 907. We reasoned:

"In the present case, that the respondent is not Beth's father is only fortuitous. Prior to her birth, having been told, and after investigation, having come to believe, that she was his child, he allowed his name to be placed on the birth certificate as her father and proceeded to act as her father. He was present in the delivery room when she was born and he lived with her and her mother, with the exception of periods of separation, both before and after he married her mother, from the time of Beth's birth. He has, in short, treated the child as if she were his biological child from the time of her birth up to, and beyond, the determination that [s]he is not. From the time of her birth, until recently, and then only for a short time, Beth lived in Baltimore County. For much of that time, she lived with the petitioner and the respondent. Even when she was placed in the physical custody of the petitioner, the respondent, pursuant to the separation agreement, exercised liberal visitation. Indeed, he had joint custody with the petitioner. The evidence at the hearing further tended to prove that the child viewed the respondent as her father; she is

bonded to him, and he to her. According to Dr. Leon Rosenberg, the respondent is Beth's psychological father.

\* \* \*

"On the other side of the ledger, aside from the relationship between Beth and the petitioner, no evidence was presented concerning what Beth's living arrangements would be were custody to be transferred to the petitioner. Nor was there evidence presented as to the relationship that exists between Beth and her mother's paramour."

*Id.* at 776–77, 621 A.2d at 906–07.

Although we noted in *Monroe* that a psychological bond may form between a child and a third party, we did not suggest that this bond alone necessarily will overcome the right of the legal parent to custody and control over visitation. Nor did we conclude that *de facto* parent status necessarily overcomes such parental rights. *Monroe* simply is not inconsistent with our holdings in *McDermott* and *Koshko,* or our holding today.

*Monroe* was based on an analysis of the record as a whole. In light of the facts before the Circuit Court, we observed that "a trier of fact could find, as the master did, exceptional circumstances." *Id.* at 777, 621 A.2d at 907. We acknowledged, however, that the issue could not be resolved as a matter of law. On that point, we observed:

"We do not, of course, express any opinion as to the outcome of this custody matter. We do not wish to suggest that, on remand, custody could not be awarded to the petitioner; it certainly could. We simply wish to provide guidance for the trial court in addressing the issue of permanent custody. We want to make clear that, using its independent judgment, the court has to determine whether the circumstances *of this case* are sufficiently exceptional as to rebut the presumption that custody should be awarded to the petitioner."

*Id.*

Our guidance to the Circuit Court was that it was to consider the totality of the facts to determine whether excep-

tional circumstances existed. As Margaret K. notes, one of the key issues before the court in *Monroe* was the psychological bond between the child and father. We emphasized, however, the putative father's belief that he was the child's biological father from the time of her birth. We noted that upon learning of her pregnancy, the child's mother had taken a voice stress analysis test to prove that the putative father was the child's actual parent. The mother passed that test and, as a result, the putative father took part in the birthing process and placed his name on the child's birth certificate as her father. The couple lived together with the child from the time of her birth until nearly four years later. During that time they married. When the couple divorced, they agreed in the separation agreement, "to joint custody of the child 'born to the parties prior to their marriage,' that the primary residence of the child would be the [mother's], and that the [father] would have visitation rights." *Id.* at 761, 621 A.2d at 899. Even after the blood tests revealed that the putative father was not the child's biological parent, he continued to fight for visitation and custody. We noted that in such a situation, the putative father might even have been equitably estopped [12] from disclaiming his paternal obligations:

---

**12.** Equitable estoppel in the context of child support proceedings has been applied in some states to prevent a party from refusing to pay child support after he or she has held himself or herself out to be the parent of a child. *See e.g., Shondel J. v. Mark D.*, 7 N.Y.3d 320, 820 N.Y.S.2d 199, 853 N.E.2d 610 (2006). The concept is not, however, the equivalent of "parenthood by estoppel." "Parenthood by estoppel" prevents one legal parent from denying a party visitation or custody rights where the legal parent previously has taken affirmative steps or actions to treat that party as the actual parent of his or her child. *Compare* American Law Institute, Principles of the Law of Family Dissolu- tion: Analysis and Recommendations § 2.03(b), at 107 (softcover ed. 2003) *and* § 3.03, at 412. While equitable estoppel and the doctrine of parenthood by estoppel may be related concepts, one does not follow necessarily from, or equate to, the other. *See Van v. Zahorik*, 227 Mich.App. 90, 575 N.W.2d 566, 572 (1997) (refusing to find that a party who could be equitably estopped from denying child support would necessarily satisfy Michigan's equitable parent doctrine). *But cf.* § 2.03(1)(b)(i), at 107 (stating that any party obligated to pay child support qualifies as a parent by estoppel).

"Where a man provides support and care to a child believing, as a result of the mother's representations, that he is the child's father and, thereafter, after being told and, indeed, efforts have been made to prove that he is not, he continues to insist that he is, it is quite likely that he will be deemed to be equitably estopped to deny his obligation to continue to provide for the care and support for the child."

*Id.* at 770 n. 7, 621 A.2d at 903 n. 7.

■ Contrary to Margaret K.'s contention, *Monroe* demonstrates that exceptional circumstances are not established through a rigid test, but rather by an analysis of all of the factors before the court in a particular case.[13] *See Sider v. Sider,* 334 Md. 512, 532–33, 639 A.2d 1076, 1086 (1994). *See also Troxel,* 530 U.S. at 73, 120 S.Ct. at 2064, 147 L.Ed2d at 61, (noting that "most state-court adjudication in this context occurs on a case-by-case basis"). Chief Judge Robert C. Murphy, writing for the Court in *Sider,* 334 Md. 512, 639 A.2d 1076, later amplified and explained this principle. In *Sider,* the Court remanded the case for further proceedings to resolve a dispute between a natural parent and a third party. The issue to be decided on remand was whether exceptional

---

**13.** Margaret K.'s argument that we recognized a special status for *de facto* parents in *Monroe v. Monroe,* 329 Md. 758, 621 A.2d 898 (1993), fails as well because the putative father in that case based his claim for custody on factors additional to those necessary to demonstrate *de facto* parenthood—*i.e.,* his longtime belief that he was the child's biological father—and accordingly, would meet the definition of a "parent by estoppel" more closely than a *de facto* parent. *See* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.03(b), at 107 (softcover ed. 2003) (noting that under the American Law Institute's definition, a parent by estoppel may include an individual who lived with a child for two or more years under "a reasonable, good-faith belief that he was the child's biological father" and "continued to make reasonable, good-faith efforts to accept responsibilities as the child's father"). As the American Law Institute has concluded, the additional factors necessary to meet the definition of a parent by estoppel give such parties "priority over a *de facto* parent ... in the allocation of primary custodial responsibility." *Id.* § 2.03 Comment, at 110–11. We emphasize, however, that even after we considered the additional factors in *Monroe,* we refused to conclude as a matter of law that the putative father satisfied the requirements to demonstrate exceptional circumstances.

circumstances existed to justify granting custody to the third party. Chief Judge Murphy instructed:

"On remand, the circuit court should consider the following factors set forth in *Ross v. Hoffman, supra,* and any other relevant factors, in determining whether exceptional circumstances exist:

'(1) the length of time the child has been away from the biological parent;

'(2) the age of the child when care was assumed by the third party;

'(3) the possible emotional effect on the child of a change of custody;

'(4) the period of time which elapsed before the parent sought to reclaim the child;

'(5) the nature and strength of the ties between the child and the third party custodian;

'(6) the intensity and genuineness of the parent's desire to have the child; and

'(7) the stability and certainty as to the child's future in the custody of the parent.'

"We listed other important factors in *Turner [v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992)]:

'the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs. An important consideration is the child's past relationship with the putative father. (citation omitted). Finally, other factors might even include the child's ability to ascertain genetic information for the purpose of medical treatment and genealogical history.'

327 Md. at 116–17[,607 A.2d 935, 940]. We also stated in *Monroe, supra:*

'Whether the child has established a relationship with a third party sufficient to constitute exceptional circumstances, rebutting the presumption of custody in the biological parent, is not dependent on its development

during the absence of the biological parent. A relationship resulting in bonding and psychological dependence upon a person without biological connection can develop during an ongoing biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent. That the relationships, one with a known biological parent and the other with an acknowledged, though, in fact, non-biological, parent, progress at the same time, does not render either less viable.'

329 Md. at 775–76[, 621 A.2d 898, 906]. We would further note that it is ordinarily in the best interest of a child to be raised with his or her siblings. *See Hild v. Hild,* 221 Md. 349, 359, 157 A.2d 442[,447] (1960); *Melton v. Connolly, supra,* 219 Md. [184] at 190, 148 A.2d 387[,390]; *Hadick v. Hadick,* 90 Md.App. 740, 748, 603 A.2d 915[,919] (1992)."
*Sider,* 334 Md. at 532–33, 639 A.2d at 1086.

Exceptional circumstances are determined by analyzing any and all relevant factors in the particular custody or visitation case. Accordingly, while the psychological bond between a child and a third party is *a factor* in finding exceptional circumstances, it is not determinative. Likewise, a finding that one meets the requirements that would give that person *de facto* parent status, were that status to be recognized, is a strong factor to be considered in assessing whether exceptional circumstances exist. It is not, however, determinative as a matter of law.

Accordingly, we hold that the Circuit Court erred in granting visitation to Margaret K. on the grounds that she was a *de facto* parent without first finding either that Janice M. was an unfit parent or that sufficient exceptional circumstances existed to overcome Janice M.'s liberty interest in the care, custody, and control of her child.

Although the Circuit Court found that exceptional circumstances did not exist, we shall nonetheless remand for reconsideration of that matter. The Circuit Court based its conclu-

sion on an improper standard. Therefore, a remand to that court is necessary, to allow it to determine whether, based on all relevant facts, exceptional circumstances exist.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.*

RAKER, J., dissents and files opinion.

RAKER, Judge, dissenting:

I respectfully dissent. One thing is clear: the Maryland Legislature is silent when it comes to the question of visitation with children when a non-traditional family is dissolved. In the face of this silence, I believe that a *de facto* parent is different from "third parties" and should be treated as the equivalent of a legal parent, with the same rights and obligations.[1] *See Troxel v. Granville,* 530 U.S. 57, 63, 120 S.Ct. 2054, 2059, 147 L.Ed.2d 49 (2000) (noting that "[t]he demographic changes of the past century make it difficult to speak of an average American family"); *N.A.H. v. S.L.S.,* 9 P.3d 354, 359 (Colo.2000) (observing that "[p]arenthood in our complex society comprises much more than biological ties, and litigants increasingly are asking courts to address issues that involve delicate balances between traditional expectations and current realities"). I would recognize the concept of *de facto* parenthood, and would hold that, in the context of visitation, once a

---

1. Recognizing *de facto* parenthood status is especially relevant because, as the majority notes, whether same-sex couples may adopt in Maryland remains unsettled. *See Janice M. v. Margaret K.,* 404 Md. 661, 665, n. 3, 948 A.2d 73, 75 n. 3 (2008) ("The issue of whether same-sex couples may adopt a child in Maryland has not been briefed in this case and we express no opinion on the issue").

party establishes that he or she fits within the status of a *de facto* parent, proof of parental unfitness or exceptional circumstances is inapplicable, and the decision as to visitation is controlled by the best interest of the child standard alone.

The *de facto* parenthood test has its origins in the Wisconsin case of *In Re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995), *cert. denied, Knott v. Holtzman*, 516 U.S. 975, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995). H.S.H.-K. involved a custody battle after a lesbian couple ended their long-term relationship. The birth mother of the child, who had become pregnant through *in vitro* fertilization and had given birth during the course of the relationship, sought to deny her former partner visitation and custody. The lower courts agreed with the biological mother and denied visitation or custody to the petitioner. The Wisconsin Supreme Court reversed.

Two questions were presented to the Wisconsin Supreme Court: whether Holtzman could petition for custody and whether she could petition for visitation. *Id.* at 420. The court said that she could not petition for custody but could petition for visitation based on the judiciary's equitable power over visitation issues. Petitions for visitation were permissible when a court "determines that the petitioner has a parent-like relationship with the child and that a significant triggering event justifies state intervention in the child's relationship with a biological or adoptive parent." *Id.* at 435. The Wisconsin Supreme Court adopted the following four-part test:

(1) the biological or adoptive parent must have consented to, and fostered, the petitioner's formation of a parent-like relationship;

(2) the petitioner and the child must have lived together in the same household;

(3) the petitioner must have assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing to the child's support, without expectation of financial

compensation a petitioner's contribution to a child's support need not be monetary; and

(4) the petitioner must have been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.* at 435–36.

The Wisconsin test set forth a high bar for establishing *de facto* parent status, minimizing concerns that it could be applied too broadly. The first factor, that the biological parent consented to and fostered the formation of a parent-like relationship, eliminates the majority's fear that recognition of *de facto* parenthood will open the floodgates for litigation by babysitters, foster parents and the like. *See Janice M. v. Margaret K.*, 404 Md. 661, 686, 948 A.2d 73, 88 (2008) ("The issues ... could arise in a myriad of other circumstances, including disputes involving step-parents, grandparents, and parties in a relationship with 'a significant other' ").

The court discussed also the necessity of a significant triggering event to justify state intervention in a child's relationship with a biological or adoptive parent. The court reasoned as follows:

"To establish a significant triggering event justifying state intervention in the child's relationship with a biological or adoptive parent, the petitioner must prove that this parent has interfered substantially with the petitioner's parent-like relationship with the child, and that the petitioner sought court ordered visitation within a reasonable time after the parent's interference.

The petitioner must prove all these elements before a circuit court may consider whether visitation is in the best interest of the child. The proceedings must focus on the child. When a non-traditional adult relationship is dissolving, the child is as likely to become a victim of turmoil and adult hostility as is a child subject to the dissolution of a marriage. Such a child needs and deserves the protection of

the courts as much as a child of a dissolving traditional relationship."

*H.S.H.-K.*, 193 Wis.2d at 659, 533 N.W.2d at 421 (citations omitted).

Since *H.S.H.-K.*, the American Law Institute has adopted and promulgated a definition for a *de facto* parent in a treatise setting forth principles governing the allocation of custodial and decision-making responsibilities for children. *See Janice M. v. Margaret K.*, 404 Md. 661, 681, 948 A.2d 73, 85 (2008); AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.03(1)(c) (2003) (adopted May 16, 2000) ("ALI PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION").[2] In § 2.04, the American Law Institute includes a *de facto* parent as one of the parties with standing to bring an action for the determination of custody, subject to the best interests of the child analysis.[3] The commentary to § 2.03(c) indicates that "[t]he requirements for becoming a *de facto* parent are strict, to avoid unnecessary and inappropriate intrusion into the relationships between legal parents and

---

**2.** The definition for a *de facto* parent is set forth in the AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.03(1)(c) (2003) ("ALI PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION"), as follows:

"A *de facto* parent is an individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,
(i) lived with the child and,
(ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions,
(A) regularly performed a majority of the caretaking functions for the child, or
(B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived."

**3.** Other parties include a legal parent, a parent by estoppel, a biological parent, an individual allocated custodial responsibility or decision-making responsibility regarding the child under an existing parenting plan, or where the court grants permission for intervention because it determines exceptional circumstances exist. ALI PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION § 2.04.

their children." ALI Principles of the Law of Family Dissolution § 2.03 comment c. The requirement that the legal parent consent to the formation of a parent-child relationship, barring any complete failure of the legal parent that would amount to parental unfitness, again assuages any fear that the standard conflicts with the liberty interest of parents in the custody and care of their children identified in *Troxel.*

Many of our sister states have recognized that *de facto* parenthood[4] status entitles a party otherwise considered as "a third party" to equal standing as a legal parent in visitation or custody matters. The Massachusetts Supreme Judicial Court recognized the concept of *de facto* parent in *E.N.O. v. L.M.M.,* 429 Mass. 824, 711 N.E.2d 886 (1999), *cert. denied, L.M.M. v. E.N.O.,* 528 U.S. 1005, 120 S.Ct. 500, 145 L.Ed.2d 386 (1999). In *E.N.O.,* the Massachusetts Supreme Court addressed a custody and visitation dispute between a same-sex couple. The biological mother had denied the petitioner access to a child born during the course of their relationship. The court held that the family and probate court traditionally enjoyed equity jurisdiction and, in spite of a lack of statutory authority, the court could find that, pursuant to the best interest of the child, the child's *de facto* parent should be allowed visitation with the child. *Id.* at 892–93. The holding of the court was in part based on its conclusion that "recognition of *de facto* parents is in accord with notions of the modern family." *Id.* at 891. The court explained as follows:

> "A child may be a member of a nontraditional family in which he is parented by a legal parent and a *de facto* parent. A *de facto* parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The *de facto* parent resides with the child and, with the consent and encouragement of the legal

---

4. States have used terms such as "parent-like status," and "psychological parenthood" to address a third party who seeks custody or visitation because that party has played a parental role in a child's upbringing. *See, e.g., In re Custody of H.S.H.-K.,* 193 Wis.2d 649, 533 N.W.2d 419 (1995) and *V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539 (2000).

parent, performs a share of caretaking functions at least as great as the legal parent. The *de facto* parent shapes the child's daily routine, addresses his developmental needs, disciplines the child, provides for his education and medical care, and serves as a moral guide.

The recognition of *de facto* parents is in accord with the notions of the modern family. An increasing number of same gender couples, like the plaintiff and defendant, are deciding to have children. It is to be expected that children of nontraditional families, like other children, form parent relationships with both parents, whether those parents are legal or *de facto*. Thus, the best interests calculus must include an examination of the child's relationship with both his legal and *de facto* parent."

*Id.* at 891 (citations and footnotes omitted). *See also V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 (2000) (recognizing special status for psychological parents); *Rubano v. DiCenzo*, 759 A.2d 959, 976 (R.I.2000) (finding no "infer[ence] [of] legislative intent to preclude standing to a *de facto* parent" and concluding that "a person who has no biological connection to a child but who has served as a psychological or *de facto* parent to that child may ... establish his or her entitlement to parental rights vis-a-vis the child"); *A.C. v. C.B.*, 113 N.M. 581, 829 P.2d 660 (Ct.App.2002) (recognizing same-sex dual parent relationship and reversing trial court's ruling that a coparenting agreement was *per se* unenforceable), *cert. denied, C.B. v. A.C.*, 113 N.M. 449, 827 P.2d 837 (1992).

Courts have continued to recognize the *de facto* parenthood concept post-*Troxel*. In *In re Parentage of L.B.*, 155 Wash.2d 679, 122 P.3d 161 (2005), *cert. denied, Britain v. Carvin*, 547 U.S. 1143, 126 S.Ct. 2021, 164 L.Ed.2d 806 (2006), the Washington Supreme Court was confronted with a custody and visitation dispute between former partners in a same-sex relationship. The court held that Washington's common law recognizes the status of *de facto* parents. *Id.* at 163. The court recognized that "[i]n the face of advancing technologies and evolving notions of what comprises a family unit, this case causes us to confront the manner in which our state, through

its statutory scheme and common law principles, defines the terms 'parents' and 'families.'" *Id.* at 165. The court concluded that parties who satisfy the requirements of *de facto* parenthood are "in parity with biological and adoptive parents in our state," explaining as follows:

> "Reason and common sense support recognizing the existence of *de facto* parents and according them the rights and responsibilities which attach to parents in this state. We adapt our common law today to fill the interstices that our current legislative enactment fails to cover in a manner consistent with our laws and stated legislative policy.
>
> * * *
>
> We thus hold that henceforth in Washington, a *de facto* parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise. As such, recognition of a person as a child's *de facto* parent necessarily 'authorizes [a] court to consider an award of parental rights and responsibilities ... based on its determination of the best interest of the child.' A *de facto* parent is not entitled to any parental privileges, as a matter of right, but only as is determined to be in the best interests of the child at the center of any such dispute."

*Id.* at 176–77 (citations and footnotes omitted). *See also C.E.W. v. D.E.W.*, 845 A.2d 1146 (Me.2004) (recognizing *de facto* parent status and placing a *de facto* parent in parity with a statutory parent); *Middleton v. Johnson*, 369 S.C. 585, 633 S.E.2d 162 (Ct.App.2006) (finding that an ex-boyfriend who lived with the child for nine years should be recognized as a psychological parent or de facto parent, gaining visitation rights); *In re Bonfield*, 97 Ohio St.3d 387, 780 N.E.2d 241 (2002) (finding that because state statute specifically defined "parent," it would be "inappropriate to ... broaden the narrow class of persons" to include biological mother's same-sex partner and thus partner was "not entitled to the benefit of statutes that are clearly inapplicable to such a familial arrangement," but concluding courts do have jurisdiction to consider petition for shared custody as not preempted by statute); *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913, 920 (2001)

(concluding lesbian partner "assumed a parental status and discharged parental duties with the consent of [the biological mother]" and thus has standing as person in loco parentis to bring action for partial custody and visitation); *In re Parentage of A.B.*, 818 N.E.2d 126, 131–33 (Ind.Ct.App.2004) (holding common law permits recognition of former same-sex partner of biological mother as legal coparent of child conceived by artificial insemination during relationship); *In re E.L.M.C.*, 100 P.3d 546, 558–61 (Colo.Ct.App.2004) (finding a compelling state interest in preventing harm to child satisfies strict scrutiny analysis and affirming recognition of "psychological parent" doctrine in context of former same-sex partner's petition for equal parenting time), *cert. denied, Clark v. McLeod*, 545 U.S. 1111, 125 S.Ct. 2551, 162 L.E.2d 287 (2005).

The rationale underlying the *de facto* parent test is not inconsistent with *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), nor does it contradict the Supreme Court's jurisprudence, or this Court's jurisprudence, in addressing the liberty interest of parents in the care, custody, and control of their children. *See In re E.L.M. C.*, 100 P.3d 546 (holding that despite *Troxel*, parental unfitness need not be shown). *Troxel* did not decide whether a finding of unfitness is a condition precedent to recognizing rights of a nonparent. *See W.C. ex rel. A.M.K.*, 907 P.2d 719 (Colo.Ct.App.1995) (rejecting father's argument that unfitness must be shown to interfere with fundamental right to direct upbringing of child). A *de facto* parent fits within the category of legal parents and should be treated as though "in parity" with legal parents in visitation matters. *See In re Parentage of L.B.*, 122 P.3d at 178. As such, granting a *de facto* parent equal rights over a child does not implicate the liberty interest a legal parent possesses in the care, custody, and control of his or her child. Significantly, the *Troxel* plurality expressly decided that it would not:

"consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a

condition precedent *to granting* visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context."

*Troxel v. Granville,* 530 U.S. at 73, 120 S.Ct. at 2064.

Furthermore, the test to determine *de facto* parenthood is narrowly tailored and allows a person to overcome the presumption in favor of a natural parent's rights only after that party demonstrates that he or she is in essence a parent to the child. As Chief Judge Joseph F. Murphy, Jr. explained, writing for the Court of Special Appeals in *Janice M. v. Margaret K.:*

> "The person who claims to be a child's *de facto* parent must successfully shoulder the burdens of (1) pleading, (2) production of evidence, and (3) persuasion. We can take judicial notice that in almost every home occupied by adults and children, the adults perform *some* parental functions on behalf of the children. Under the above quoted test, however, a person who performed parental functions is not entitled to *de facto* parent status unless the court finds as a fact that the child's legal parent has actually fostered such a relationship. Because the test we adopted in *S.F. v. M.D., supra,* is a strict one, neither our holding in that case nor our holding in the case at bar will open the floodgates to claims of *de facto* parenthood asserted by persons who can prove nothing more than that, while living with the natural or adoptive parent of a child, they performed some parental functions on behalf of the child.

> "Rare are the case like the case at bar, in which the circuit court was presented with evidence that (as summarized in the argument of Margaret K.'s counsel) 'Maya was with Margaret [K.] every day of her life in this country until August of 2004[and][t]he only reason that Margaret [K.] has been deprived of the opportunity to have a relationship with her daughter is because she wasn't on that decree of adoption.' "

*Janice M. v. Margaret K.,* 171 Md.App. 528, 539–40, 910 A.2d 1145, 1152 (2006) (transliteration in the original). I agree with Chief Judge Murphy.

The Supreme Court's opinion in *Troxel v. Granville* did not prohibit the recognition of *de facto* parents. *See Troxel,* 530 U.S. at 68, 120 S.Ct. at 2061 (noting that "special factors . . . might justify the State's interference with [the biological mother's] fundamental right to make decisions concerning the rearing of her [children]"). The Supreme Court refused to define the specific scope of a parent's liberty interest, leaving the states to address the matter. As the majority in this case notes:

> "The plurality [in *Troxel*] declined to define the precise scope of the parental due process right in the visitation context and declined to answer the question of whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm. *Id.* at 73, 120 S.Ct. at 2064. Instead, the Court rested its holding on the sweeping breadth of the Washington statute, stating as follows:
>
> > 'In this respect, we agree with Justice Kennedy that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best 'elaborated with care.' Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter.' "

*See Janice M. v. Margaret K.,* 404 Md. 661, 674, 948 A.2d 73, 80 (2008) (citation omitted). The *Troxel* plurality noted the lack of "special factors" justifying interference with the parent's liberty interest, comparing the Washington statute to other states, where a standard is required showing that a parent "has denied (or unreasonably denied) visitation to the concerned third party." *Troxel,* 530 U.S. at 68, 71, 120 S.Ct. at 2061, 2063. Justice Souter, in his concurrence, criticized the Washington statute for not requiring a "substantial rela-

tionship" as a threshold matter. *Id.* at 77, 120 S.Ct. at 2066. Justice Kennedy went further, noting in his dissent that "a fit parent's right vis-a-vis a complete stranger is one thing; her right vis-a-vis another parent or a *de facto* parent may be another." *Id.* at 100–01, 120 S.Ct. at 2079.

We have attempted to clarify the principles noted in *Troxel* in *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005), and *Koshko v. Haining*, 398 Md. 404, 921 A.2d 171 (2007). In *McDermott* we explained "that parental unfitness and exceptional circumstances are threshold considerations in third party custody determinations; *Koshko* made clear that those considerations apply in third party visitation disputes." *See Janice M. v. Margaret K.*, 404 Md. 661, 680, 948 A.2d 73, 84 (2008). Both opinions dealt with the rights of pure third parties, and not those of *de facto* parents. *See McDermott*, 385 Md. at 356, 869 A.2d at 772 (delineating the distinction between "pure third-party cases" and cases involving "psychological parents, third parties who have, in effect, become parents"); *Koshko*, 398 Md. at 443, 921 A.2d at 194. They do not address the issue before the Court today.

In my view, *Monroe v. Monroe*, 329 Md. 758, 621 A.2d 898 (1993), provides support for adoption of the *de facto* parent doctrine. *Monroe* dealt with a non-biological party who sought custody and visitation. Writing for the Court, Chief Judge Bell pointed out that "[w]hat is important, rather, is the relationship that exists between the child and each of the parties." *Id.* at 775, 621 A.2d at 906. Significantly, we noted as to a man denying support to a child, even though the child turns out not to be his biological child, we stated as follows:

"Where a man provides support and care to a child believing, as a result of the mother's representations, that he is the child's father and, thereafter, after being told and, indeed, efforts have been made to prove that he is not, he continues to insist that he is, it is quite likely that he will be deemed to be equitably estopped to deny his obligation to continue to provide for the care and support of the child."

*Id.* at 770 n. 7, 621 A.2d at 903 n. 7 (citation omitted). We noted in *Monroe* that protection of a child's relationship with a non-biological parent is warranted "when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent." *Id.* at 775, 621 A.2d at 906. Although in *Monroe* we were discussing "exceptional circumstances," the rationale of our discussion applies to the *de facto* parent discussion. We stated as follows:

"Whether the child has established a relationship with a third party sufficient to constitute exceptional circumstances, rebutting the presumption of custody in the biological parent, is not dependent on its development during the absence of the biological parent. A relationship resulting in bonding and psychological dependence upon a person without biological connection can develop during an ongoing biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent."

*Id. Monroe* supports the argument that *de facto* parent status, if established, is different from a pure third party.

*Monroe* provides support also for an alternative basis for applying the best interests of the child analysis, the recognition of a parent by estoppel. As the majority notes, we theorized that "the putative father might even have been equitably estopped from disclaiming his parental obligations." *See Janice M. v. Margaret K.,* 404 Md. 661, 692, 948 A.2d 73, 91–92 (2008). We explicitly said in *Monroe* that "it is quite likely that [a man providing support and care believing that he is the child's father] will be deemed to be equitably estopped to deny his obligation to continue to provide for the care and support for the child." *Id.* at 770 n. 7, 621 A.2d at 903 n. 7. While the majority argues that equitable estoppel is not an equivalent concept to parenthood by estoppel, *see Janice M. v. Margaret K.,* 404 Md. 661, 692 n. 12, 948 A.2d 73, 91–92 n. 12 (2008), the American Law Institute's definition of a parent by estoppel includes any individual who, though not a legal

parent, is obligated to pay child support under § 3 of the treatise.[5] Section 3.03 provides for the kind of equitable estoppel we discussed in *Monroe*. The recognition of the psychological bond and equitable estoppel from denying parental support suggested by *Monroe* provide strong foundation for the recognition of *de facto* parenthood status in Maryland law.

As Margaret K. points out in her brief, a finding that a person qualifies as a *de facto* parent does not result automatically in visitation rights. Such determination only leads to the next question: What is in the best interest of the child? *See, e.g., In re Parentage of L.B.*, 122 P.3d at 177 (stating that "[a] *de facto* parent is not entitled to any parental privileges, as a matter of right, but only as is determined to be in the best interest of the child at the center of any such dispute").

Several of our sister states, in considering non-parents' assertions of parental rights, reject a finding of parental unfitness as a predicate for state interference with the par-

---

**5.** Section 2.03(b) of the ALI PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION provides as follows:

"A parent by estoppel is an individual who, though not a legal parent,

"(i) is obligated to pay child support under Chapter 3; or

"(ii) lived with the child for at least two years and

  (A) over that period had a reasonable, good-faith belief that he was the child's biological father, based on marriage to the mother or on the actions or representations of the mother, and fully accepted parental responsibilities consistent with that belief, and

  (B) if some time thereafter that belief no longer existed, continued to make reasonable, good-faith efforts to accept responsibilities as the child's father; or

"(iii) lived with the child since the child's birth, holding out and accepting full and permanent responsibilities as parent, as part of a prior co-parenting agreement with the child's legal parent (or, if there are two legal parents, both parents) to raise a child together each with full parental rights and responsibilities, when the court finds that recognition of the individual as a parent is in the child's best interests; or

"(iv) lived with the child for at least two years, holding out and accepting full and permanent responsibilities as a parent, pursuant to an agreement with the child's parent (or, if there are two legal parents, both parents), when the court finds that recognition of the individual as a parent is in the child's best interests."

ent's right to control the upbringing of their children. *See, e.g., Downs v. Scheffler,* 206 Ariz. 496, 80 P.3d 775 (Ct.App. 2003); *In re Custody of C.C.R.S.,* 892 P.2d 246 (Colo.1995) (rejecting parental unfitness standard in favor of the best interests of the child test in contest between biological mother and psychological parents); *Roth v. Weston,* 259 Conn. 202, 789 A.2d 431(2002); *Rideout v. Riendeau,* 761 A.2d 291 (Me. 2000); *Blixt v. Blixt,* 437 Mass. 649, 774 N.E.2d 1052 (2002); *Moriarty v. Bradt,* 177 N.J. 84, 827 A.2d 203 (2003); *Williams v. Williams,* 132 N.M. 445, 50 P.3d 194 (Ct.App.2002); *State ex rel. Brandon L. v. Moats,* 209 W.Va. 752, 551 S.E.2d 674, 684 (2001) (concluding that two-prong standard of best interests of child and lack of substantial interference with parents' right meets *Troxel* requirements).

For the reasons noted above, I would hold that a *de facto* parent stands in legal parity with a legal parent, whether biological, adoptive, or otherwise, for the purposes of visitation. Accordingly, I would not apply the threshold determinations of parental unfitness or exceptional circumstances that we required in *McDermott* and *Koshko.* A party who has demonstrated that he or she is a child's *de facto* parent should be entitled to visitation rights if such a result is in the best interest of the child.